Estate of Fletcher E. Awrey, Elton R. Awrey et al., Executors, Petitioner, v. Commissioner of Internal Revenue, Respondent.

Docket No. 3827.   Promulgated June 11, 1945.

*Elorion Plante, C. P. A.*, for the petitioners.

*Melvin S. Huffaker, Esq.*, and *Philip M. Clark, Esq.*, for the respondent.

232

OPINION.

Disney, *Judge*: The first issue is as follows: As of the date of decedent's death, to what extent, if any, did decedent's wife have an interest in her husband's one-quarter share in the partnership business known as Awrey Bakeries. The answer to this question is governed by section 811 (a) and (e) of the Internal Revenue Code, the provisions of which are set forth in the margin.[1]

---

[1] SEC. 811. GROSS ESTATE.

The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States—

(a) DECEDENT'S INTEREST.—To the extent of the interest therein of the decedent at the time of his death ;

\*        \*        \*        \*        \*        \*        \*

(e) JOINT AND COMMUNITY INTERESTS.—

(1) JOINT INTERESTS.—To the extent of the interest therein held as joint tenants by the decedent and any other person, or as tenants by the entirety by the decedent and spouse, or deposited, with any person carrying on the banking business, in their joint names and payable to either or the survivor, except such part thereof as may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth : Provided, That where such property or any part thereof, or part of the consideration with which such property was acquired, is shown to have been at any time acquired by such other person from the decedent for less than an adequate and full consideration in money or money's worth, there shall be excepted only such part of the value of such property as is proportionate to the consideration furnished by such other person \* \* \*.

In schedule F of the estate tax return filed by the estate of Fletcher E. Awrey, there is included as owned by the decedent at the time of his death an undivided one-quarter interest in the partnership business known as Awrey Bakeries. The value assigned therein to that undivided one-quarter interest is $197,537.49. It has been stipulated that the correct value of that one-quarter interest is $250,000.

Respondent recognizes that the issue is "purely one of fact" and contends that "for estate tax purposes, the undivided one-fourth interest in question at the date of death, and at all times since about 1920, has been the property of the decedent and that the value thereof as of the date of his death is properly includible in the value of his gross estate."

Petitioner concedes that "a partnership did not exist between Fletcher Awrey and his wife,"[2] but contends that "the wife did have the right to own her separate property and retain earnings attributable to her personal labor" and that she owned one-half of decedent's share in the partnership "by virtue of the fact that she had furnished the original investment and put a lot of time and effort and energy in the early days of the business." No agreement of partnership between decedent and his wife is relied on.

The fact that Mrs. Awrey was not a member of the partnership known as Awrey Bakeries is not fatal to her contention here. *Berkowitz* v. *Commissioner*, 108 Fed. (2d) 319. See also *Estate of Lester L. Fletcher*, 44 B. T. A. 429. The question is whether under all the facts she was a coowner with her husband of the interest standing in his name. She contributed the original capital about 1910, in the sense that with her own funds she repaid a loan of $200 with which the business was started, and used another $100 for supplies. Also, she contributed services to the business, for which she was not compensated. These services consisted mainly of clerking in a store at times, and looking after the finances of the business, more than did her husband, up to about 1920. Likewise, she was consulted about business matters until decedent's death. On the other hand, she was never considered a partner in the business itself, either after the formal partnership was set up in 1927 or prior thereto, for that agreement states that the father and three sons had for a long period conducted a baking business as a partnership, without written articles of agreement, and it provides that the partnership capital shall be "the assets of the partnership already operating" and that each partner shall be considered as having contributed one-quarter of that amount and shall therefore retain and have a one-quarter interest. The decedent's returns from 1935 to 1939 were individual returns.

---

[2] Our several findings of fact are consistent with this concession.

Mrs. Awrey never, prior to 1940, returned any income for Federal tax purposes, and in his return for 1938 the decedent stated that she had no income. Had the petitioner's wife been the owner of a one-half interest, or other interest, in her husband's partnership interest, she would have had income therefrom, and her failure to return such income can reasonably be explained only on the theory that she did not really consider herself the owner of such interest.

The claim here is that the wife was the owner of one-half of a business and property interest, i. e., the petitioner's share in the partnership, of an agreed value of $250,000. The claim, it is to be noted, is based not upon contract between husband and wife, but upon her contribution, about 1910, of the original capital, and her contribution of services, uncompensated, to the business. The capital contributed was $300. The record shows that after about 1920 the wife contributed no services, except that she was consulted on major matters, though to an increasingly less degree as time passed; the record also shows that up to about the time the wife discontinued her activities except as to such consultation, the business was very small in comparison with its extent when the petitioner died in 1939, as of which date it is claimed the wife owned half of a $250,000 interest. About 1920, when the older sons returned from military service, there were about six stores; in 1939, when decedent died, there were about 90, with plant facilities accordingly enlarged. Thus it is apparent that the wife's industry contributed at the most, in substance, only to the development of about six stores, and that the further development of the extensive business existing in 1939 is logically to be ascribed not to the activity of the wife (or of the husband, who appears, in effect, to have occupied no position other than that of a baker), but to the industry and ability of the three sons, who in effect conducted the business after 1920. There is breach of logic, therefore, in a view that the wife, by contribution made, should be regarded as owner of a large interest in the extensive and prosperous business existing in 1939.

This idea, we think, is borne out by the attitude taken as to good will in forming the new partnership in 1940. Good will of the business, obviously an important matter, was specifically excluded from consideration of the contribution by the wife to the new partnership, it being agreed that the sons were the exclusive owners of such good will; yet, had the wife been the owner of a one-half or other interest in her husband's partnership interest, she would have been the owner of an interest in the good will. In this connection, it should be noted that the fact that the sons and their mother entered into a partnership in 1940 (she contributing not an interest in the former business, but a note for $201,502, based upon an appraisement of the partnership, expressly

excluding good will as above seen), does not indicate recognition that the mother already had an interest. She was her husband's residuary legatee after payment of debts and expenses. She therefore was entitled, under the will, to the one-fourth interest of the decedent in the partnership.

The petitioner has cited, among other cases found to be less parallel in fact, *Max German*, 2 T. C. 474, and *Berkowitz* v. *Commissioner*, 108 Fed. (2d) 319. The latter case offers no assistance in the present matter because in that case there was an agreement between husband and wife, permitted by the law of Pennsylvania, whose statutes do not preclude partnership between husband and wife. No such agreement is present in this case.

The *Max German* case is based largely upon the law of Missouri. Section 2998, par. 5055, vol. 7, Missouri Statutes Ann., permits a married woman to carry on and transact business and contract and be contracted with as a *femme sole*. No such broad emancipatory statute is to be found in the Michigan statutes in effect during the taxable years involved in this case. Again, it is pointed out in the *Max German* case that the law is well settled in Missouri that a wife can contract with her husband with the same freedom as with others. No Michigan cases to the same effect are cited to us, and diligent research has failed to reveal any. Indeed the contrary would appear to be inferable from such cases as *Lutz* v. *Dutmer*, 286 Mich. 467; *Kuntz* v. *Kuntz*, 244 Mich. 78; *Lesher* v. *Brosteau*, 238 Mich. 189, which hold that husband and wife may not (at the time herein involved) enter into a contract of partnership. Moreover, petitioner on brief apparently so concedes, saying that "a husband and wife constituting one person could not contract with each other." That the law of Michigan differs from that of Missouri, as relied on in the *German* case, in respect to a wife's services is apparent from the following excerpt from the opinion of the Supreme Court of Michigan in the case of *Detroit & Security Trust Co.* v. *Gitre*, 254 Mich. 66; 235 N. W. 884, 887:

\* \* \* The right of a married woman to the "earnings acquired by any such married woman as the result of her personal efforts," Comp. Laws 1929, § 13061, covers services performed by her for others than the family as well as apart from her household duties. \* \* \* [citations] The statute does not convert the marital relationship into a business partnership *nor raise a money debt from husband to wife for her services to him, even though they take her outside the strict ambit of the domestic circle, and consist of aid to him in his business.* [Italics supplied.]

See also *Kuntz* v. *Kuntz, supra; Gregory* v. *Oakland Motor Car Co.*, 181 Mich. 101; 147 N. W. 614, 617. For the foregoing reasons, we are of the opinion that the present case is distinguishable from the *Max German* case.

Considering the whole record before us, we are of the opinion that the contribution of the original capital (in the sense that she paid the $200 note with money from her father and put $100 into supplies) and the contribution of services until about 1920, with some consultative capacity thereafter, is not sufficient basis for considering the wife as owner of an interest in her husband's partnership interest, but is rather to be ascribed to her general interest as a wife in the family welfare. We therefore conclude and hold that the Commissioner did not err in including in decedent's gross estate the entire one-fourth partnership interest.

The second issue is: As of the date of decedent's death, to what extent, if any, was decedent's wife the owner of certain properties standing in their joint names? The answer to this question is also governed by section 811 (a) and (e) of the code, set forth in the margin under footnote No. 1.

In schedule E of the estate tax return there is included one-half the value at the time of decedent's death of nine items of jointly owned property, including three tracts of real estate. The total value assigned therein to all of these items is $15,722.52. The respondent determined that the full value thereof, to wit, $31,445.04, should have been included in decedent's gross estate. Item No. 8 relates to certain household furniture the value of which is listed in schedule E as $250; the Commissioner determined that the full value thereof, to wit, $500, should be included in decedent's gross estate. Petitioner, however, has failed to assign this particular determination as error. Therefore, if petitioner's contention that one-half of the jointly owned properties acquired with her separate funds are not includible in decedent's gross estate is upheld, the amount to be excluded would be $15,972.52. The decedent, in individual Federal income tax returns placed in evidence, took all deductions as to the jointly held real estate, and only he reported income therefrom.

It is clear that these jointly owned properties were acquired with funds drawn from or consisting of several savings bank deposits which stood in the joint names of decedent and his wife and which had as their source decedent's share of the partnership distributions. Having held under the first issue that decedent's wife had at the time of his death no interest in his share of the net worth of the partnership, we are of the opinion that the value of the contested items as of the time of decedent's death should properly be included in his gross estate. We, therefore, hold that the Commissioner did not err in including the total value of such property in decedent's gross estate.

The third issue is: Were certain gifts made by decedent to his

children and his wife made in contemplation of death within the meaning of section 811 (c) of the code? [3]

The principles to be followed in determining whether the gifts here involved were made in contemplation of death are set forth in *United States* v. *Wells*, 283 U. S. 102. The following excerpts from that opinion furnish us with the guideposts upon which we base our judgment, bearing in mind that the petitioner has the burden of overcoming the presumption in favor of the correctness of the Commissioner's determination and the rebuttable statutory presumption affecting gifts made by decedent within two years prior to his death:

* * * The dominant purpose is to reach substitutes for testamentary dispositions and thus to prevent the evasion of estate tax. (Citations) * * * The question, necessarily, is as to the state of mind of the donor.

* * * The words "in contemplation of death" mean that the thought of death is the *impelling cause* of the transfer, * * *

If it is the thought of death, as a *controlling motive* prompting the disposition of property, that affords the test, it follows that *the statute does not embrace gifts inter vivos which spring from a different motive.* * * *.

* * * It is sufficient if contemplation of death be the *inducing cause* of the transfer whether or not death is believed to be near. [Emphasis supplied.]

We are of the opinion that the respondent erred in determining that the various gifts, a summary of which is set forth in the margin,[4] were made by decedent in contemplation of death within the meaning of section 811 (c). In reaching this conclusion we have not overlooked

---

[3] SEC. 811. GROSS ESTATE.

The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States—

* * * * * * *

(c) TRANSFERS IN CONTEMPLATION OF, OR TAKING EFFECT AT DEATH.—To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of * * * his death * * * except in case of a bona fide sale for an adequate and full consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this subchapter.

[4] The summary is as follows:

| Date | Donees | Value/d |
|---|---|---|
| Dec. 9, 1936 | Fern A. Meyering (daughter) | $4,800.00 |
| Dec. 15, 1936 | Mary Awrey Winchester (daughter) and William B. Winchester. | 4,800.00 |
| Dec. 11, 1937 | Mary Awrey Winchester (daughter) | 4,800.00 |
| | Fern A. Meyering (daughter) | 4,800.00 |
| | Elton R. Awrey (son) | 5,334.38 |
| Dec. 30, 1937 | Wilbur S. Awrey (son) | 5,334.38 |
| | Thomas L. Awrey (son) | 5,334.38 |
| Dec. 23, 1938 | Mary Awrey Winchester (daughter) | 4,800.00 |
| | Fern A. Meyering (daughter) | 4,800.00 |
| | Elton R. Awrey (son) | 5,264.06 |
| Dec. 31, 1938 | Wilbur S. Awrey (son) | 5,264.06 |
| | Thomas L. Awrey (son) | 5,264.06 |
| Apr. 13, 1939 | Elizabeth E. Awrey (wife) | 5,000.00 |
| | Elton R. Awrey (son) | 5,018.75 |
| June 2, 1939 | Wilbur S. Awrey (son) | 5,018.75 |
| | Thomas L. Awrey (son) | 5,018.75 |
| June 23, 1939 | Mary Awrey Winchester (daughter) | 4,950.00 |
| | Fern A. Meyering (daughter) | 4,950.00 |

decedent's advanced age at the time he made these various gifts [5] or decedent's operation in July 1936 and the condition of his health from that time until his death in December 1939.[6] Respondent suggests on brief that the amount of the various gifts (about $5,000 each) "suggest the possibility of wishing to avoid payment of gift tax"; but that is a purpose associated with life rather than death.[7] Respondent also suggests on brief that "Elton to a large extent seems to have taken care of his father's financial affairs for some time prior to his death"; and the facts also show that Mrs. Awrey took the initiative in suggesting the making of some of these gifts. Such facts as these fail, in our opinion, to support respondent's contention that decedent's motive in making these gifts was induced by the thought of death. If they accomplish anything they tend to disprove the existence of any motive on decedent's part.

However, the record does show that the gift to Mary A. Winchester on December 15, 1936, was motivated primarily by a desire on decedent's part to relieve his daughter and son-in-law from the burden of making payments on the mortgage on their home held by decedent and his wife. The desire to treat both daughters alike adequately explains decedent's motive in making the gift on December 9, 1936, to Fern A. Meyering. The dominant motive on decedent's part in making the gift to his daughter Fern on December 11, 1937, was to enable her and her husband, who were in moderate circumstances due in part to their missionary work in Turkey and his studying for his doctorate, to buy and own their own home outright. Decedent's motive in making the gift to Mary on the same day is also adequately explained by decedent's desire to treat his daughters alike. This, likewise, in our opinion, explains in part the motive for the gifts in 1937 made by decedent to his sons, the source of these gifts being a distribution to decedent by the partnership. But the motive for these gifts and the subsequent gifts made by decedent to his sons, all of which were from the same source, namely, the partnership, is also explained by the fact that, although decedent ceased to work in the business after his operation in July 1936, nevertheless he was still credited with a very sizeable amount of the partnership profits, in fact with an amount substantially equal to that of each of his three sons, who did all the work. These facts prove that these gifts sprang from a different motive than that urged by respondent, namely, contemplation of death. In addition to the fact, already suggested, that decedent desired to treat all his children alike, the gifts in 1938 and 1939 to his children were motivated also by the fact that by 1938 decedent had established a policy of making annual gifts to his children of approximately $5,000 each. Finally, the gift to Mrs. Awrey

[5] Cf. *United States* v. *Wells*, 283 U. S. 102.
[6] *Emily J. Pratt et al., Executrices*, 18 B. T. A. 377.
[7] *Anna Ball Kneeland et al., Executors*, 34 B. T. A. 816, 818.

in 1939 was, in our opinion, motivated only by the desire on the part of decedent to satisfy her wishes to have a small account belonging solely to herself and this gift was not made in contemplation of death.

As to the gifts made by the decedent after he learned in the spring of 1939 that he was afflicted with cancer, we do not think that that knowledge indicates that the contemplation of death actuated him. They were entirely in line with the gifts he had been making prior to such knowledge. Had he upon learning of his true condition desired for that reason to make gifts, he would reasonably have greatly increased the amount, and perhaps the number, of the gifts. Considering his financial ability to increase his donations and the fact that there is no change in his acts in that respect, we think that there exists no more reason for ascribing to the later gifts a contemplation of death than to those made earlier.

These are only some of the facts which in our opinion justify the conclusion we have reached on this issue. Other facts, such as the amount of the gifts as compared with decedent's net worth, the trips taken by decedent, his weekly walks to the office, his apparently cheerful spirits, his lack of knowledge of his true condition until the spring of 1939, his belief when informed that he was suffering from a cancer that the doctor was mistaken, all speak for themselves and require no further comment. We conclude that the thought of death was neither the "impelling cause," nor the "controlling motive," nor the "inducing cause," of the transfers made by the decedent in this case, and that, therefore, the value of none of these gifts is properly includible in decedent's estate.

Reviewed by the Court.

*Decision will be entered under Rule 50.*