ESTATE OF J. LAWRENCE DAVIS, DECEASED, BY MADGE W. DAVIS & MARTHA D. ALTIERI, EXECUTRICES, Petitioner v COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Davis v. Commissioner
Docket No. 11265-77.
United States Tax Court
T.C. Memo 1979-461; 1979 Tax Ct. Memo LEXIS 63; 39 T.C.M. (CCH) 509; T.C.M. (RIA) 79461; November 21, 1979, Filed William C. Cassebaum, for the petitioner. Louis T. Conti, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a deficiency of $14,480.75 in petitioner's estate tax. Concessions having been made, the only issue remaining for decision is whether certain transfers of stock made by decedent within three years of his death are includable in his estate as transfers made in contemplation of death. FINDINGS OF FACT Some of the facts were stipulated and are found accordingly. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. The decedent, J. Lawrence Davis, died on March 6, 1974, a resident of the Borough of Bangor, Northampton County, Pennsylvania. The executrices *64 of his estate, Madge W. Davis, his wife, and Martha D. Altieri, his daughter, filed a Federal estate tax return in December 1974. Madge W. Davis was a resident of Bangor, Pennsylvania, and Martha D. Altieri was a resident of Easton, Pennsylvania, at the time the petition herein was filed. Decedent was born on February 3, 1905, and was 69 years of age when he died. He had been an attorney actively engaged in the practice of law and knowledgeable about the estate tax laws.
The cause of decedent's death was respiratory failure and acidosis, precipitated by emphysema and chronic bronchitis. Decedent was also suffering from pneumonia but this was not related to the immediate cause of death. Decedent had been suffering from emphysema for about 12 years before his death. The disease was progressive and incurable. Decedent and his family became aware of the seriousness of his condition some time in 1972. [1]
*65 Decedent was admitted to Saint Luke's Hospital in Lehigh County, Pennsylvania, on April 15, 1973, for a prostate operation. At the time, he was suffering from severe emphysema, benign prostatic hypertrophy, and arteriosclerotic heart disease. A prostatectomy was performed on April 19, 1973. The decedent was ambulatory when discharged on April 29, 1973. He was given instructions to receive continued, supervised care of his pulmonary problem at home. Decedent was again admitted to Stain Luke's Hospital on November 6, 1973, suffering from chronic obstructive lung disease, respiratory acidosis, and chronic respiratory failure. He was discharged on November 30, 1973. On February 24, 1974, decedent was readmitted to Saint Luke's Hospital with acute and chronic obstructive lung disease and metabolic encephalopathy. He also suffered from dyspnea (painful breathing) and had lost 30 pounds during the previous year. On February 27, 1974, a tracheostomy was performed. The decedent never left the hospital, and, on March 6, 1974, he died. Decedent was limited in his physical activities to short walks and drives from October 1973 until his death. He stopped going to his law office *66 in October 1973 but continued to work at home. Because of decedent's poor health, in the years immediately preceding his death decedent and his wife led a less active social life than they had in previous years and did not entertain or go out much socially. Since decedent found breathing difficult in cold weather, he and his wife would travel to warm climates, if possible, in the winter. In the winter of 1971 to 1972, they went on a long cruise to Hong Kong and in the winter of 1972 to 1973, they went to Arizona. Decedent and his wife intended to spend the winter of 1973 to 1974 in Florida. As was their habit, they made their plans about six months in advance so that their decision to spend the winter in Florida was made by the summer of 1973. Because of decedent's deteriorating health, the plans to go to Florida were never carried out. Martha D. Altieri was decedent's only child. Her son, Jody Lawrence Altieri, born in 1967, was decedent's only grandchild. Martha and her husband, Joseph Altieri, owned a riding stable. Martha had not received a college education. Prior to the birth of her son, Martha had worked as a legal secretary for her father's law firm; thereafter, *67 she worked as her father's personal secretary one day a week and was compensated for her services. Martha and Joseph Altieri had adjusted gross income, as shown on their joint individual income tax returns, of $4,220 in 1970, $7,984 in 1971, $5,793 in 1972, $4,109 in 1973, and $5,322 in 1974. Decedent made the following gifts of securities which respondent contends were made in contemplation of death: Donee
Date
Item
Transfer Value [2]
Martha Altieri
10/11/72
50 shares, First
National Bank in
Bangor
$ 8,750
3/ 3/73
25 shares, Second
National Bank of
Nazareth
750
8/73
200 shares, First
Valley Bank Corp.
10,000
2/74
50 shares, First
Valley Bank Corp.
2,500
Jody Altieri
10/11/73
1,000 shares, First
Valley Bank Corp.
50,000
2/74
5 shares, First Valley
Bank Corp.
250
Total
$72,250
The decedent had previously made gifts of securities to his daughter, Martha, as follows: Date
Item
Transfer Value
9/14/64
8 shares, First National Bank
in Bangor $ 240
1/26/65
100 shares, Second National
Bank of Nazareth
2,500
2/ 4/66
10 shares, The Pen Argyl National
Bank
400
3/29/66
5 shares, First National Bank of
Per Argyl
550
6/14/66
5 shares, Easton National Bank
& Trust Co.
1,000
2/26/70
4 shares, Standard Oil of N.J.
200
3/ 3/70
25 shares, The Second National
Bank of Nazareth
800
4/30/70
60 shares, Penn Central R.R.
1,380
5/ 1/70
6 Warrants, A.T.&T.
Modest
*68 Martha was 23 years old at the time decedent made his first gift of securities to her in 1964. Decedent had previously made gifts of securities to his grandson Jody, as follows: Date
Item
Transfer Value
9/18/68
500 shares, Louis Burk Co. $500
2/ 5/69
1 share, The Citizens National
Bank of Slatington
100
4/ 1/70
50 shares, Allstate Enterprises
Stock Fund, Inc.
500
7/15/71
4 shares, The Citizens National
Bank of Slatington
150
Jody Altieri was one year old at the time he first received a gift of securities from decedent. Of the gifts made to Jody Altieri, all were made outright, except the one on October 11, 1973, which was made under an irrevocable trust agreement, whereby decedent, the settlor, gave 1,000 shares of the capital stock of First Valley Corporation to Martha Altieri and First Valley Bank as trustees for the benefit of Jody Altieri. The trust agreement provided as follows: (a) TRUSTEES shall pay the entire net income of the Trust to or for the benefit of Jody Lawrence Altieri, quarterly, to assist in providing him with an education and the enrichment of his life generally, such as through travel and familiarity with *69 the arts (by participation or observation), for the purpose of affording opportunities which might not otherwise be available to him. (b) TRUSTEES shall pay from the principal of said Trust Property such sums as TRUSTEES, in their uncontrolled joint discretion, shall think necessary and proper to provide an education and other advantages for Jody Lawrence Altieri, including attendance at preparatory schools, colleges and universities, as an undergraduate or a graduate student, and thereafter to continue his education and cultural activities in such way and to such extent as the discretion of TRUSTEES shall dictate and the capacity of the fund shall permit. (c) With recognition that basic needs must be provided for as a prerequisite to education and life enrichment, TRUSTEES shall also distribute to or for the benefit of Jody Lawrence Altieri such portions, if any, of the Trust Property as in the joint discretion of the TRUSTEES shall be necessary for the support, medical care and comfortable maintenance of Jody Lawrence Altieri, taking into consideration all other income and cash resources available for such purposes, from all sources known to TRUSTEES. The corpus *70 and undistributed income of the trust were to be distributed to Jody, at his request, in three parts, when he attained the ages of 25, 30, and 35 years. The decedent, by a will dated July 28, 1971, bequeathed 1,000 shares of stock of First National Bank in Bangor to his daughter Martha. Decedent was the chairman of the board and largest shareholder of the First National Bank in Bangor. The residue of the estate was given to his wife, Madge W. Davis. The First National Bank in Bangor merged into First Valley Bank in the summer of 1973 and each share of stock in the First National Bank in Bangor was exchanged for three and a half shares of stock in First Valley Bank. By a codicil dated October 3, 1973, decedent made clear that, due to the merger, Martha was entitled to a legacy of 3,500 shares of First Valley Bank.
ULTIMATE FINDINGS OF FACT The transfers of securities by decedent to his daughter, Martha, on October 11, 1972, and in August 1973, were made in contemplation of death. The transfer of securities by decedent to a trust for the benefit of his grandson Jody on October 11, 1973, was made in contemplation of death. The transfers of securities by decedent to Martha *71 on March 3, 1973, and in February 1974, and to Jody in February 1974, were not made in contemplation of death. OPINION The issue for decision is whether certain gifts of securities from decedent to his daughter and grandson are includable in his gross estate under section 2035 [3] as transfers made in contemplation of death. That section is intended "to reach substitutes for testamentary dispositions and thus to prevent evasion of the estate tax." United States v. Wells, 283 U.S. 102, 117 (1931). Subsection (b) of section 2035 creates a rebuttable presumption that the transfers in question, which occurred within three years of death, were made in contemplation thereof. Estate of Honickman v. Commissioner, 58 T.C. 132, 135 (1972), affd. without opinion 481 F.2d 1399 (3d Cir. 1973). The resolution of the issue before us turns on whether decedent's dominant motive for making the transfers, as determined *72 from all the facts and circumstances, was the thought of death or a purpose normally associated with life. United States v. Wells, supra at 118; Estate of Gerard v. Commissioner, 57 T.C. 749, 758 (1972), affd. per curiam 513 F.2d 1232 (2d Cir. 1975). Although we have carefully considered all cases cited by the parties in support of their positions, they have only tangential value because, in this area, each case must ultimately turn on a weighing and balancing of its own particular facts. Allen v. Trust Co.,326 U.S 630, 636 (1946); Estate of Ford v. Commissioner, 53 T.C. 114, 122 (1969), aff. per curiam 450 F.2d 878 (2d Cir. 1971). See also, Estate of Johnson v. Commissioner, 10 T.C. 680, 688 (1948). Petitioner takes the position that the decedent did not intend the gifts in question to be substitutes for testamentary dispositions, but rather intended them as vehicles for supplementing the income of his daughter, Martha, and for making available to his grandson, Jody, educational opportunities which Martha and her husband might be unable to provide. A desire to provide *73 financial assistance or education to family members has been recognized as a factor indicating that a gift was prompted by lifetime motives rather than the thought of death. Estate of Gerard v. Commissioner, supra at 759; Estate of Hutchinson v. Commissioner, 20 T.C. 749, 756 (1953); Estate of Wilson v. Commissioner, 13 T.C. 869, 871 (1949), affd. per curiam 187 F.2d 145 (3d Cir. 1951). The record shows that decedent, an attorney, was an educated and prosperous man with a gross estate of $453,038, exclusive of the transfers in question herein. [4] His daughter, Martha, on the other hand, had not attended college, and she and her husband had a low income during the years preceding decedent's death. By these facts, together with Martha's testimony at trial about her father's wishes and the terms of the trust decedent established for Jody, we are persuaded that decedent had the intentions ascribed to him by petitioner. The existence of these intentions, however, is not in itself decisive of the issue before us, Estate of Gerard v. Commissioner, supra at 759, without a further determination as *74 to whether such purposes associated with life were the primary motivation or impelling cause of the transfers in question. Allen v. Trust Co.,supra at 636. The gifts should be considered in the context of decedent's bodily and mental condition at or near the time they were made. United States v. Wells, supra at 117; Estate of Lowe v. Commissioner, 64 T.C. 663, 673 (1975), affd. per curiam 555 F.2d 244 (9th Cir. 1977). Decedent had emphysema for about 12 years before his death. While petitioner is correct in asserting that the mere fact that a decedent had a serious illness does not preclude the possibility that gifts were not made in contemplation of death, Estate of Awrey v. Commisioner, 5 T.C. 222, 242 (1945), [5] the record herein clearly reveals, not only that the decedent had a *75 chronic illness (considered incurable and to have death-producing quality), but further that the gifts in question were made during a period when his health was deteriorating and when medical treatment, hospitalization, and restrictions on his daily activity must have served as a continual reminder of his declining health. [6]
We see no need to repeat the sequence of events making the various stages of decendent's medical condition and his personal activities, which are set forth in detail in out findings of fact. Suffice *76 it to say that, in light of the evidence of repeated hospitalization, deterioration of health, and curtailment of activity reflected in our findings, we are unpersuaded by petitioner's argument that decedent was in good spirits, negating an inference of transfers in contemplation of death. Compare Estate of Johnson v. Commissioner, supra at 689. We are also unimpressed by petitioner's argument that decedent's plans, made in the summer of 1973, to go to Florida the following winter, indicate that decedent, despite his poor health, had an optimistic outlook unclouded by thoughts of death. We note that vacations in warm climates were necessitated by decedent's respiratory problems and that he and his wife routinely made their vacation plans far in advance. The record does, however, support petitioner's contention that, because of the contrast between his own financial circumstances and those of his daughter and her husband, decedent had established a policy of giving gifts of securities to his daughter and grandson. Prior to 1972, decedent had made nine gifts of securities to Martha, beginning in 1964 when she was 23 years of age, and four gifts of securities *77 to Jody, starting in1968 when he was one year old. This policy, initiated prior to the transfers in question herein and prior to the deterioration of decedent's health in the last year-and-a-half of his life, sheds considerable light on the question of decedent's dominant motive for the subsequent transfers. [7]Estate f Johnson v. Commissioner, supra at 688-689; Estate of Awrey v. Commissioner, supra at 242. Weighing the evidence of this prior pattern of gifts in conjunction with the evidence of the financial need of decedent's daughter and grandson against the evidence of decedent's deteriorating health, we conclude that, as to those transfers which were consistent in value with the prior pattern, petitioner has borne the burden of proving that provision of eduction and financial assistance, rather than substitution for testamentary dispositions, was the dominant motive. [8] Cf. Estate of Lowe v. Commissioner, supra at 676. [9] Our conclusion as to each gift is set forth in our ultimate findings of fact. See p. 10, supra. *78 Petitioner contends that the apparent deviations from the pattern of prior gifts can be reconciled by taking into account the increase in decedent's resources caused by the merger in 1973 of the First National Bank in Bangor, in which he was the principal shareholder, and the First Valley Bank Corporation. [10] While an increase in a decedent's resources immediately prior to a gift may sometimes give rise to an inference that the thought of death was not the dominant motive for the gift, Skall v. United States355 F. Supp. 778, 783 (N.D. Ohio 1972); Kniskern v. United States, 232 F. Supp. 7, 13 (S.D. Fla. 1964), on the facts of this case, we are not convinced that the increase in decedent's resources was a sufficiently significant inducement for the gifts to overcome the other elements which are consistent with a motive associated with death. [11]
*79 Petitioner argues that, if decedent had been predominantly motivated by a desire to reduce the tax on his estate, he would have transferred a larger portion of his estate prior to his death. In view of the other circumstances revealed in this record, argument along these lines is totally insufficient to tip the scale in petitioner's favor. Indeed, it is equally plausible that decedent, who was knowledgeable in estate tax law, anticipated that any large transfer of assets would not escape inclusion in his estate under section 2035. Moreover, the three major gifts by decedent, which we have found to be exceptions to his prior pattern of gifts, amounted to a transfer within a one-year period of over 12 percent of his remaining gross estate valued as of the date of death. See footnote 4, supra. We do not consider this percentage to be negligible. [12]
We conclude, therefore, on *80 the basis of the entire record before us, that thoughts of death, stimulated by decedent's deteriorating health, were the impelling cause of those transfers which were not in conformity with decedent's prior pattern of gifts. We hold that the securities transferred to Martha on October 11, 1972, [13] and in August 1973 and the securities transferred to a trust for the benefit of Jody on October 11, 1973, are includable in decedent's estate as property transferred in contemplation of death. Decision will be entered under Rule 155. Footnotes
1. The stipulation of the parties states that "as of 1972, decedent know of the seriousness of his condition." One of his physicians, in a questionnaire stipulated by the parties, stated that he first treated decedent for the condition which caused death on August 8, 1972, and that the time when decedent was informed of the seriousness of the condition was "approximately 1972."↩
2. In regard to the significance of the term "transfer value," see footnote 7, infra↩.
3. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the taxable year in issue. Section 2035 was subsequently amended by the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1848.↩
4. This is the value of the gross estate as reported in the estate tax return, with adjustments agreed upon by the parties as stated in the notice of deficiency. The estate tax return showed a date of death value for the gross estate of $542,654 and a value of $459,350 as of the alternate valuation date.↩
5. Accord, Estate of Kaye v. Commissioner, T.C. Memo. 1973-270↩. 6. Skall v. United States,355 F. Supp. 778 (N.D. Ohio 1972), and Kniskern v. United States, 232 F. Supp. 7↩ (S.D. Fla. 1964), cases on which petitioner heavily relies, are clearly distinguishable because the transfers in question therein were made during periods when the decedents, despite their advanced age, were enjoying good health and countervailing motives associated with life were clearly revealed. Moreover, in both cases, the subject matter of the transfers was recently acquired accretions to wealth by decedent for which he had no need.
7. In evaluating the prior pattern of gifts, and for all other purposes, we have employed the "transfer values" to which the parties have stipulated, interpreting the term "transfer values" as a stipulation, solely for the purposes of this case, of the value of the gifted securities at all relevant times. ↩
8. Respondent calls attention to the gap of over a year between the first of the transfers in question and the last prior transfer of securities to Martha or Jody. We attach no significance to this hiatus because the pattern of the prior gifts reveals that decedent did not adhere to any well-defined time schedule in making the gifts. ↩
9. See Estate of Martin v. Commissioner↩, a Memorandum Opinion of this Court dated December 7, 1943.
10. We can find no evidence in the record showing that the merger actually did increase decedent's net worth, but respondent has conceded this point on brief. Nor is there any evidence in the record to support petitioner's contention that, because of the merger, decedent lost his position as controlling shareholder and no longer considered it necessary to retain his stock. ↩
11. Compare Estate of Kaye v. Commissioner, footnote 5, supra↩, cited by petitioner, wherein, despite a decline in health, a prior pattern of gift-giving was not altered.
12. Compare Estate of Selling v. Commissioner, 24 T.C. 191, 195↩ (1955), where a transfer of approximately 10 percent of the decedent's gross estate, spread over a 5-year period, was held to be inconsistent with the theory that the transfers were made in contemplation of death.
13. While we are less clear in our minds about the includability of this transfer, we have concluded that, at a minimum, petitioner has failed to carry its burden of overcoming the statutory presumption.↩