ESTATE OF JESSIE I. APPLE, DECEASED, MARTHA JANE APPLE, EXECUTRIX, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Responent
Estate of Apple v. Commissioner
Docket No. 5468-81.
United States Tax Court
T.C. Memo 1983-422; 1983 Tax Ct. Memo LEXIS 367; 46 T.C.M. (CCH) 802; T.C.M. (RIA) 83422; July 21, 1983. James H. Stethem,Stephen M. Goodson and Garry W. O'Donnell, for the petitioner. Kenneth P. Dale, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined a deficiency in petitioner's Federal estate tax of $47,228.68. After concessions by the parties, the sole issue presented for decision is whether certain gifts of Jussie I. Apple to her two children, on December 30 and December 31, 1976, were made in contemplation of death, within the meaning of section 2035, Internal Revenue Code, [1] and were therefore includible in her gross estate. *369 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The joint exhibits are also incorporated herein by this reference. Jessie I. Apple (hereinafter "decedent") died on May 30, 1977, at the age of 87. Martha Jane Apple is decedent's daughter, and is the Executrix of decedent's estate, the petitioner herein. On February 24, 1978, petitioner filed a federal estate tax return with the Internal Revenue Service Center at Covington, Kentucky, disclosing a gross estate of $156,166.04, and a taxable estate of $140,116.70. On December 19, 1980, respondent issued his statutory notice of deficiency to petitioner with respect to its Federal estate tax return. Petitioner was a resident of Dayton, Ohio, at the time that the petition herein was filed. After the death of decedent's husband in 1948, the decedent and her two children, William A. Apple (hereinafter "William") and Martha Jane Apple (hereinafter "Martha"), took control of the unincorporated family business, theretofore run by decedent's husband, and incorporated it under the name of W.A. Apple Mfg., Inc. Decedent, William and Martha were the original and only shareholders of the corporation, with decedent *370 originally owning 49 shares, William owning 28 shares, and Martha owning 23 shares. The same three individuals were the corporate directors, and William was the president of the corporation, Martha was the treasurer, and decedent, until the time of her death, was the vice president. W.A. Apple Mfg., Inc. was in the business of cutting and sewing various cloth items, almost entirely on purchase order contracts for the United States Government. Decedent was always active in the family business. She typed letters, paid bills, managed the payroll, and attended meetings at the company's factory. Decedent, William and Martha lived together in decedent's home throughout most of the period between 1948 and decedent's death, and many company decisions were made by the three officers and directors at home. William frequently had to travel on company affairs, and when he was away, decedent and Martha ran the business. The business was somewhat erratic, depending upon the whims of government procurement and available appropriations. The company's employees ranged from five up to 100 at various times; from February, 1976, to February, 1977, the business was on two shifts a day, carrying *371 out a $2 million contract to supply the Federal government with 23,000 tarpaulins. For her services to W.A. Apple, Mfg., Inc., the corporation paid decedent an annual salary. During 1976, decedent was paid $6,000. On October 10, 1973, decedent made gifts to William and Martha of 21 shares each of W.A. Apple Mfg., Inc. These gifts were reported by decedent in a timely Federal gift tax return, at a total value of $218,988, and decedent paid a gift tax of $34,197.30 thereon. These gifts exhausted the specific exemption of $30,000 for gift tax purposes, under section 2521, which was then available to decedent. After these gifts, decedent retained seven shares of W.A. Apple Mfg., Inc. On September 29, 1976, the decedent entered into an installment redemption agreement with W.A. Apple, Mfg., Inc. Under the terms of this agreement, decedent transferred her remaining seven shares of stock to the corporation for a total purchase price of $53,200. The corporation paid decedent $10,640 at the time of redemption, with the balance, plus interest, to be paid in four equal annual installments commencing on September 30, 1977. The parties have stipulated that the balance of the purchase *372 price due at the time of decedent's death was properly includible in her gross estate. Even after the disposition of her stock, decedent remained active in the management of W.A. Apple Mfg., Inc., and continued thus until the time of her death. Decedent was also actively involved (with William and Martha) in a second and separate incorporated family business, involving the ownership and operation of a motel. This business was dissolved in 1976, when the corporate assets were sold. At that time, decedent was serving as a director and as treasurer of the corporation. For a person in her 80's, decedent was in reasonable health in the years immediately prior to her death. For many years she had lived with chronic congestive heart failure, a disease that is controllable when an individual receives proper medication from a doctor. Decedent's heart condition was not one that developed in her twilight years, but rather was a medical problem that decedent had apparently lived with since an early age. Decedent was never diagnosed as having a terminal disease, nor was she told that she was in imminent danger of dying. She did not have a regular personal physician, but would consult *373 with a doctor at the Family Health Center in Dayton, Ohio, whenever a specific problem or change in her condition occurred.Between June of 1976 through March of 1977, decedent did not consult with a physician, and her health was relatively good. She was not entirely happy about going to doctors and taking medicine, and was apparently included to do without either as much as possible. Her attitude in this regard appears to have been influenced by her life-long attachment to the Christian Science faith, whose tenets included the belief that the ills that afflict the body are mainly curable by oneself through a correct understanding and application of Christian Science principles to the Scriptures. Decedent did not discuss death, nor does it appear that she considered her death to be imminent. On May 24, 1976, decedent was temporarily hospitamized due to the swelling, or edema, normally associated with congestive heart failure. Decedent responded to medical treatment and was released by June 3, 1976. Beginning in 1975, decedent used a wheelchair from time to time, where extended walking might be involved. This use resulted from a hip replacement operation performed in 1965. *374 At that time, decedent had been warned that the replacement would last only five or six years. In fact, it did not begin to fail for ten years. Between November of 1976 and March of 1977, decedent took three trips to Florida with William and Martha. On all three trips, decedent rode in an automobile nonstop from Dayton, Ohio, to Atlanta, where decedent and her children spent the night. On the following morning, they would again drive nonstop to St. Petersburg, Florida.On the return trip, the process was reversed. On one of these trips, an additional sight-seeing excursion was made from Atlanta to Plains, Georgia. Up until the time of her death, decedent remained mentally alert and interested in the world around her. She enjoyed visiting friends, playing cards, and dining out. She ran her own household, and took care of all her personal needs by herself. Decedent had a long history of making gifts to her children as well as to other individuals, going back to the year 1954. So far as William and Martha were concerned, her gifts were in the form of real estate, securities or cash. With two or three exceptions, her gifts were made equally between the two children. The *375 table below shows the total annual gifts made by decedent to her children in the years indicated, not including the gifts here in issue: Year
Amount of Gifts
1954
$ 16,000.00
1955
100.00
1956
100.00
1958
1,000.00
1961
2,754.66
1964
9,000.00
1968
2,100.00
1970
4,000.00
1973
[2] 218,988.00
1974
6,000.00
1975
6,000.00
Total $266,042.66
In the same period (1954 through 1976), decedent made gifts, in amounts varying between $20 and $1,000, to one or more of a group of about 15 persons other than her children. Gifts in some amount were made in each of the above years, although not to each member of the group in every year. All such gifts were in cash. Over the period, decedent's gifts to and among these individuals totaled $9,922. In December, 1976, William's attorneys, Smith & Schnacke, mailed a general informational letter to their clients. This letter suggested that for those clients who planned to make substantial gifts in the near future, or who had yet to exhaust their $30,000 life-time gift tax exemption, consideration should be given to makeing such gifts *376 prior to the end of calendar year 1976, due to recently enacted changes in the Federal estate and gift tax provisions, by the Tax Reform Act of 1976, Pub. L. No. 94-455. The attorneys' letter produced a reaction in William, and he consulted with his sister. They had previously purchased a condominium in Florida, which had depleted their liquid assets. William wanted to buy a boat, and he was interested in buying some additional Florida property. Martha had retired from teaching school in 1972, and although she had an income from her pension, she was concerned about advancing inflation. Each of the siblings, for their individual reasons, wanted more money. William and Martha accordingly used the attorneys' letter as a basis for approaching decedent and proposing that she make additional gifts to them before the end of 1976. Although decedent was receptive to the idea of making further gifts to her children, she had some reservations. She wanted to retain sufficient assets to insure that she could live indefinitely in the comfortable standard of living to which she had grown accustomed. Decedent further insisted that she retain, among other things, her home, and that William *377 and Martha pay the applicable gift tax resulting from the proposed gifts. William and Martha agreed to these conditions. Accordingly, and after these negotiations, decedent gave William and Martha $3,000 apiece on December 30, 1976, and on December 31, 1976, she made the following gifts in equal shares to William and Martha: Value at Date of
Assets Transferred
Decedent's Death
1.Homestead -
CD and Savings Account
$ 40,470.22
2. Citizens -
CD and Savings Accounts
33,001.90
3. Home -
CD and Savings Accounts
30,668.25
4. Hunter -
CD
10,000.00
5. Gem City -
CD and Savings Account
37,951.82
6. Montgomery County -
Savings Accounts
12,044.09
7.State Fidelity -
Savings Accounts
37,213.79
8. Land - Lot 5, Mablecrest Acres
Kettering, Ohio, containing
5/8 acre, plus app. 1 acre
adjacent to lots 6 & 7 on
Applewood Lane
31,000.00
9. 90% Shares of 1st
National Bank of Dayton
Common Stock plus 5%
stock dividend
29,797.60
10.51 Shares common stock
of Apco, Inc.
83,979.30
TOTAL
$346,126.97
The donees, William and Martha, paid Federal gift taxes of $62,301.79 resulting from the above transfers, which totaled $352,126.97. *378 On December 29, 1976, decedent executed a new will, with William and Martha being designated as decedent's principal beneficiaries. The assets transferred by decedent to William and Martha during December of 1976, comprised approximately 60% of the total assets owned by decedent at December 31, 1976. After making the gifts in question, however, decedent retained sufficient assets to maintain her customary standard of living for an indefinite period of time. She continued to own her house, a separate piece of real estate, and had investment income, social security benefits, and income from the installment redemption agreement that she had with W.A. Apple Mfg., Inc. After making these gifts to her children, decedent's living and spending habits did not change. She continued to live in her own home, and she died there. At the time of death, she had a gross estate, for Federal estate tax purposes, of $190,323.45. [3]
Upon audit of decedent's fiscal estate tax return, respondent determined, inter alia, that decedent's gifts of December *379 30 and 31, 1976, to her two children were made in contemplation of death within the meaning of section 2035, and accordingly increased the taxable estate by $289,825.18. [4] His statutory notice of deficiency was issued accordingly. Decedent's gifts to her children on December 30 and 31, 1976, were not made in contemplation of death.
OPINION The sole issue for us to decide is whether the gifts of cash and property made by decedent to her two children on December 30 and December 31, 1976, were transfers made in contemplation of death. With certain exceptions, section 2035(a), as it now exists, disposes of similar cases by simply providing that a decedent's gross estate includes all property transferred within three years of death. 4a However, prior to the passage of the Tax Reform Act of 1976, Pub. L. No. 94-455, section 2035 provided in pertinent part: (a) GeneralRule.--The value of *380 the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in the case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death. (b) Application of General Rule.--If the decedent within a period of three years ending with the date of his death (except in the case of a bona fide sale for adequate and full consideration in money or money's worth) transferred an interest in property * * * such transfer * * * shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section * * *. Since the amendment to section 2035 did not apply to transfers made before January 1, 1977, Pub. L. 94-455, section 2001(d), the resolution of this case is governed by section 2035 as it existed before the 1976 change. *381 In deciding whether the transfers here in issue were made in contemplation of death, the Supreme Court in United States v. Wells,283 U.S. 102 (1931), set out the appropriate test to be used. The Court said the following concerning what was meant by the phrase "contemplation of death" for purposes of section 402(c) of the Revenue Act of 1918, the predecessor of section 2035: It is recognized that the reference is not to the general expectation of death which all entertain. It must be a particular concern, giving rise to a definite motive * * * The statutory description embraces gifts intervivos, despite the fact that they are fully executed, or irrevocable and indefeasible. The quality which brings the transfer within the statute is indicated by the context and manifest purpose * * * The dominant purpose is to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax * * * As the transfer may otherwise have all the indicia of a valid gift intervivos, the differentiating factor must be found in the transferor's motive. Death must be "contemplated", that is, the motive which induces the transfer must be *382 of the sort which leads to testamentary disposition * * *. [United States v. Wells,283 U.S. 102, 115-117 (1931). Fn. ref. omitted] See also Cleveland Trust Co. v. United States,421 F.2d 475, 478 (6th Cir. 1970). Our inquiry must, therefore, delve into the state of mind of the decedent, a difficult task made even more difficult by the fact that the witness best qualified to give evidence on this subject was unable to testify, having gone to "the undiscovered country from whose bourn no traveler returns." [5]
In making our analysis, it is important to note that there is a presumption that inter vivos transfers of property made within three years of decedent's death are transfers made in contemplation of death. Section 2035(b). The presumption created by this statute is not, however, irrebuttable. [6] Although the petitioner has the burden of overcoming the presumption, Estate of Awrey v. Commissioner,5 T.C. 222, 240 (1945), if by a preponderance of the evidence, we conclude that the inducing cause of the transfer was not in "contemplation of death" within the meaning of *383 the statute, the value of these gifts should not be included in decedent's gross estate. Estate of Gerard v. Commissioner,57 T.C. 749 (1972), affd. 513 F.2d 1232 (2d Cir. 1975). A long litany of facts and circumstances has been considered crucial by this, and other courts, in deciding contemplation of death cases.In Estate of Johnson v. Commissioner,10 T.C. 680 (1948), this Court listed many of the relevant considerations. In that case, this Court stated: Among the circumstances to be considered and weighed in determining what was the dominant motive of the decedent in making inter vivos transfers of his property, are the following: (a) The age of the decedent at the time the transfers were made; (b) the decedent's health, as he knew it, at or before the time of the transfers; (c) the interval between the transfers and the decedent's death; (d) the amount of the property transferred in proportion to the amount of property retained; (e) the nature and disposition of the decedent, e.g., whether cheerful or gloomy, sanguine or morbid, optimistic or *384 pessimistic; (f) the existence of a general testamentary scheme of which the transfers were a part; (g) the relationship of the donee or donees to the decedent, i.e., whether they were the natural objects of his bounty; (h) the existence of a long established gift-making policy on the part of decedent; (i) the existence of a desire on the part of the decedent to escape the burden of managing property by transferring the property to others; (j) the existence of a desire on the part of the decedent to vicariously enjoy the enjoyment by the donees of the property transferred; and (k) the existence of the desire by the decedent of avoiding estate taxes by means of making inter vivos transfers of property. * * * [Estate of Johnson v. Commissioner,supra, at 688.] In the present case, some of the above circumstances support respondent's position.Others support petitioner's contention that decedent had life-related motives at the time that she made these transfers of property. No one of the above circumstances are dispositive of the issue, since all must be considered. Allen v. Trust Company of Georgia,326 U.S. 630 (1946). In this case, respondent *385 relies heavily on several circumstances to support his determination. These include: (1) decedent's age, (2) decedent's health, (3) the amount of the property transfered by decedent in relation to the amount of property retained by her, and (4) the fact that the donees were decedent's children, the natural objects of her bounty, and the primary beneficiaries under a will that was executed by decedent the day before the transfers. The importance of these factors is not disputed by the petitioner. However, petitioner contends that the facts of this case do not support respondent's arguments. Further, petitioner contends that additional circumstances point clearly to decedent's life-related motives in making these transfers. These additional circumstances include: (1) decedent's previous history of making gifts to her children, (2) the fact that the idea for making these gifts originated with William and Martha, and not the decedent, (3) decedent's desire to save gift taxes, and (4) decedent's mental outlook at the time these gifts were made. A careful consideration of all of these factors is important to our present holding. The factors relied upon by the respondent will be *386 considered first. I. Respondent's Points
Respondent relies primarily on decedent's age and health to support his argument that the gifts to William and Martha in 1976 were transfers made in contemplation of death. It is clear that decedent was elderly and in less than robust health at the time she made the transfers in question.It is true, as respondent alleges, that a decedent's advanced age and poor health have been held to be an indication of a death-related motive in making inter vivos transfers, and that considerable weight should be given to these factors when determining what was the decedent's state of mind at the time of the event. See McClure v. Commissioner,56 F.2d 548 (5th Cir. 1932), cert. denied 287 U.S. 609 (1932); Estate of Gerard v. Commissioner,supra.
In this case, decedent was 87 years old at the time that William and Martha received their gifts. The advanced age of a decedent at the time of inter vivos donations is evidence that the decedent made such gifts in contemplation of death, see English v. United States,270 F.2d 876, 881 (7th Cir. 1959). There is no question that decedent's *387 age is one factor that supports respondent's present position. To a large extent, however, respondent's argument rests upon his contention that decedent was in poor health at the time of the transfers.In 1976, decedent had a medical problem known as chronic congestive heart failure. This physical infirmity was one that decedent apparently had had for many years. Congestive heart failure is a disease that is controllable when an individual receives proper medical treatment. The record herein shows that decedent received, and took, the medication prescribed by her doctor, and was able to live with her problem. During the last years of her life, decedent's health fluctuated from that of an individual in reasonable health, to one whose medical condition required temporary hospitalization. Decedent was apparently not overly concerned with her medical problems, and did not visit her doctor unless a specific problem or change in her condition occurred. Between June of 1976 through March of 1977, decedent's medical condition was relatively good, and she did not visit a doctor. During this period, her health did not interfere with her normal activities. Medical testimony established *388 that decedent was never diagnosed as having a terminal disease, nor was she told that she was in imminent danger of dying. Decedent did not discuss death, nor is there any evidence that she considered her death to be imminent. During 1976, decedent was mentally alert, actively involved in the family business, took care of all her personal needs, and engaged in regular social visits with her friends. Between November, 1976, and March, 1977 (just two months before her death), decedent took three car trips from Dayton, Ohio, to St. Petersburg, Florida. If we are to assume, as respondent contends, that decedent was desperately ill, we do not believe that such an individual would have either the desire or the physical capacity to undertake such a rigorous personal schedule. The fact that decedent was elderly and had certain medical problems is not something that we can ignore. Yet we find that, in light of what appears to be a full and active life, decedent's age and health were not predominant factors weighing on decedent's mind at the time of the transfers in question. The facts and circumstances surrounding decedent's heath do not support respondent's inference that decedent *389 was so aged and ill as to be preoccupied with making arrangements for her ultimate demise. Respondent argues that the gifts to William and Martha were substitutes for testamentary dispositions. Respondent points to the close proximity between the dates of the gifts and the execution of decedent's last will and testament, and the fact that these gifts were given in equal portions to her two children. He also relies on the fact that the transfer of this property effectively reduced the decedent's estate by 60% of its assets. All of these facts have been cited in court decisions as evidence of a testamentary disposition. See Commissioner v. Estate of Gidwitz,196 F.2d 813 (7th Cir. 1952), affg. 14 T.C. 1263 (1950); Estate of Lowe v. Commissioner,64 T.C. 663 (1975). Yet in light of countervailing facts in this case, we do not believe that the existence of these circumstances significantly bolsters respondent's argument. The close proximity between the time of inter vivos transfers of property and the execution of a decedent's will, has been cited by some courts as an indication that the transfers of property were a part of a larger *390 testamentary scheme. This consideration has been given evidentiary weight where gifts were made by the decedent to the same individuals who were also designated as beneficiaries under the newly executed will. Estate of Hite, Sr. v. Commissioner,49 T.C. 580 (1968); Estate of Honickman v. Commissioner,58 T.C. 132 (1972), affd. 481 F.2d 1399 (3d Cir. 1973). But cf. Belyea's Estate v. Commissioner,206 F.2d 262 (3d Cir. 1953), reversing a Memorandum Opinion of this Court; Estate of Johnson v. Commissioner,supra.In this case, we place little evidentiary weight on the fact that William and Martha received property from the decedent both during her life and at the time of her death. The execution of a new will that corresponds closely with inter vivos transfers of property, is not necessarily controlling for purposes of determining whether these transfers were made in contemplation of death. [7]
Finally, respondent contends that since these gifts removed 60% of the then assets of decedent's *391 estate, the size of these gifts is evidence of an attempt to avoid estate taxes. At first blush, we might well agree. However, where, as here, the decedent retained more than sufficient assets to take care of her needs, the size of the actual gifts have little or no probative value. [8] We conclude that none of the above factors, taken together or separately, establish that these gifts were donations causa mortis, within the meaning of section 2035(a). II Petitioner's Points
Beginning in 1954, decedent established a pattern of making frequent gifts to her children, and to others, as shown in our findings of fact. From 1954 to 1976, and not including the gifts here in issue, such gifts totaled just over $266,000. The fact that decedent had previously made significant gifts of property to her children is important evidence that subsequent gifts were not testamentary dispositions. Estate of Johnson v. Commissioner,supra;Estate of Hill v. Commissioner,64 T.C. 867 (1975); *392 United States v. Wells,supra. A decedent's established practice of generosity toward his or her children is a factor that supports the inference that gifts were not made in contemplation of death. Estate of Hill v. Commissioner,supra.In the present case, decedent's long-history of generosity to her children going back over 20 years, is a strong factor that supports petitioner's present argument. In December of 1976, William received a letter from his attorney. In this letter it was suggested that for those planning to make gifts in the near future, gift tax savins would result if these transfers were made prior to the effective date of recently enacted changes in the Federal gift tax provisions. Armed with this information, William and Mary approached their mother with the hope that they might be the recipients of their mother's continued generosity. They hoped to replenish their funds, which had been depleted as a result of buying a condominium in Florida, and as a means of supplementing Martha's retirement income. William also had desires to acquire more Florida property. When the transfer of property results from suggestions *393 of the donee, it is an indication of a life-related motive. Estate of Jacobsen v. Commissioner, a Memorandum Opinion of this Court dated December 7, 1950. A decedent's desire to provide financial assistance to one or more of his offspring is a motive recognized as not in contemplation of death. Estate of Talbot v. Commissioner,T.C. Memo. 1981-560; Estate of Gerard v. Commissioner,supra.The circumstances surrounding the 1976 transfer of property to decedent's two children strongly supports the proposition that decedent made these gifts for reasons more associated with life than with death. [9]
*394 Finally, the evidence in the record indicates that decedent had a healthy mental attitude.Up and until the time of her death, decedent remained active in the family business, was mentally alert and took care of all her personal needs. Decedent did not discuss death, [10] took trips to Florida just prior to her death, and visited friends on a regular basis. She led an active and full life until the time of her death. She was generous with her children, and concerned with their welfare. She was financially independent of her children, and was determined to remain so. *395 From all of the facts and circumstances in this record, we conclude that petitioner has overcome the statutory presumption of section 2035, and has met its burden of showing that decedent did not make these gifts in contemplation of death. In accordance with this opinion, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect for the period in issue, and all Rule references are to the Rules of Practice and Procedure of this Court, unless otherwise noted.↩
2. These gifts are further described in our findings of fact, supra.↩
3. This is the amount reported in petitioner's Federal estate tax return, plus two adjustments by respondent to which petitioner has agreed.↩
4. The parties have stipulated the above figure, correcting a mathematical error in the statutory notice. In making his determination, respondent reduced the value of the gifts by the amount of Federal gift tax which was paid thereon by other donees, in the amount of $62,301.79.↩
4a. The application of section 2035(a) has been further restricted with respect to the estates of decedents dying after December 31, 1981, by the provisions of section 2035(d)↩, added by section 424(a) of the Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, 95 Stat. 172.
5. W. Shakespeare, Hamlet,↩ Act III, Sc. 1.
6. Nor may it be so, Heiner v. Donnan,285 U.S. 312↩ (1932).
7. See Estate of Howell v. Commissioner,↩ a Memorandum Opinion of this Court dated January 28, 1943.
8. See Estate of Engel v. Commissioner and Estate of Kent v. Commissioner,↩ Memorandum Opinions of this Court dated January 29, 1947, and August 12, 1947, respectively.
9. Petitioner also argues that the desire to save gift taxes by making gifts prior to the effective date of new and higher rates of tax provided by the Tax Reform Act of 1976, Pub. L. No. 94-455, on January 1, 1977, should be construed in petitioner's favor as a life-related motive on decedent's part, citing Estate of Talbot v. Commissioner,T.C. Memo. 1981-560↩. We give this argument no weight in this case, since decedent made it clear that she did not want to pay any gift tax at all in connection with these gifts; she made William and Martha shoulder this burden.
10. Petitioner urges us to find that decedent, as an active and faithful Christian Scientist, did not contemplate death. We decline this inviation, both on the basis of this record and of our common knowledge. "To every man upon this earth/Death cometh soon or late * * *" (Lord Macaulay, Lays of Ancient Rome, Horatius (1842)), and we are not convinced that decedent believed otherwise. Nor does the statute refer to "the general expectation of death which all entertain" ( United States v. Wells,283 U.S. 102, 117↩ (1931)). This record convinces us, however, that decedent was no hypochondriac, and did not exhibit undue concerns about her physical well-being, and we have so found. That this attitude may have been influenced by her religious beliefs is entirely plausible, but in any event does not weaken the significance of the fact of her mental attitude, which is the important factor here.