ESTATE OF GERTRUDE H. SCHWAB; SUZANNE S. McMURRAY and JAMES G. SCHWAB, CO-EXECUTORS and CO-TRUSTEES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Schwab v. Commissioner
Docket No. 14258-78.
United States Tax Court
T.C. Memo 1981-487; 1981 Tax Ct. Memo LEXIS 256; 42 T.C.M. (CCH) 989; T.C.M. (RIA) 81487; September 3, 1981. Lewis C. Murtaugh, for the petitioner. Val J. Albright, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined a deficiency of $ 50,076.01 in petitioner's Federal estate tax. The only issue for our determination is whether certain transfers made by or on behalf of decedent Gertrude H. Schwab (decedent) within three years of her death were made in contemplation of death within the meaning of section 2035 of the Internal Revenue Code *257 of 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Decedent died March 7, 1975. A Federal Estate Tax return for decedent's estate was timely filed with the Internal Revenue Service Center, Kansas City, Missouri. The return was signed by Suzanne S. McMurray, in the capacity as a person in possession of property of the decedent, and listed the gross estate at a value of $ 433,765.80. On December 26, 1978, the Circuit Court of Cook County, Illinois, Probate Division, appointed Suzanne S. McMurray and James G. Schwab as co-executors of the decedent's estate. At the time the petition herein was filed, the co-executors resided at the following locations: Co-Executor
Residence at Time of Filing
Suzanne S. McMurray
Glencoe, Illinois
James G. Schwab
Mequon, Wisconsin
Decedent was born October 13, 1894, and was therefore 80 years old when she died. In 1923, decedent *258 married Laurence E. Schwab (Laurence) who was born July 16, 1891. This marriage continued until Laurence's death on April 30, 1972, at the age of 80. The marriage of decedent and Laurence produced two children, James G. Schwab (James), born March 17, 1937, and Suzanne S. Schwab (Suzanne), born January 1, 1930. These children are the co-executors of decedent's estate, discussed above. Suzanne married John W. McMurray in 1954. Their marriage resulted in the following six children, who are also the grandchildren of decedent: Name
Date of Birth
John W. McMurray, Jr.
03/29/55
Anne B. McMurray
09/16/56
Laurence C. McMurray
09/17/57
Susan W. McMurray
10/01/59
Jane D. McMurray
10/26/61
Margaret K. McMurray
01/30/64
James married Katherine, his current wife, in 1964. This marriage produced the following children, who are also the grandchildren of the decedent: Name
Date of Birth
Michael L. Schwab
08/25/68
Matthew A. Schwab
01/25/71
Gertrude Wachter (hereinafter Gertrude) was the house-keeper/companion of Laurence and the decedent beginning in 1942. After Laurence's death in 1972, Gertrude continued to reside with decedent. On *259 or about April 1, 1974, Gertrude moved into the home of Suzanne where she continued to reside up to the time of trial. Since 1942, Gertrude has been considered a member of decedent's immediate family. In 1941, decedent and her husband Laurence purchased a 17-acre tract of land in Ephraim, Door County, Wisconsin, and subsequently improved it with a residence containing four bedrooms, two and one-half bathrooms, a large living room, a family room, kitchen, two-car garage, and two out-buildings. Customarily, decedent and Laurence would spend the period from spring to fall at their Door County residence and from late fall to mid-spring of the following year elsewhere. For many years prior to Laurence's death, the winter residence was at Random House in Palm Springs, California. Decedent and her husband regularly had their children and grandchildren visit them during the summers. During the year 1955, decedent gave $ 7,000 cash to Suzanne. Sometime during the 1960's, decedent and Laurence gave to Suzanne and James equal undivided interests in an unimproved 7-acre parcel of the Door County tract. Decedent suffered a stroke in 1966 and another one in 1969. Some of the effects *260 of these two strokes were to impair her ability to move around; she required a cane, a walker, or an arm, and her ability to write was reduced to making a mark. In 1969, decedent and her husband Laurence had to purchase an inclinator for decedent's use because she was unable to climb the stairs in her Door County residence unaided. Following the strokes and the death of Laurence, Gertrude attended decedent on a twenty-four-hour-a-day basis. She was decedent's constant companion, sleeping in the same room with her although decedent resided in a four-bedroom house. During August 1970 the decedent was hospitalized as a result of a hiatus (stomach) hernia. A hiatus hernia is one in which part of the stomach protrudes into the thoracic cavity, causing usually minor distress in the form of sticking of food, regurgitation of food or acid, and easy filling of the stomach. The distress occurs when the stomach becomes overly filled, particularly if the person is supine or bends over. The condition is permanent unless it is surgically corrected. Decedent complained to Gertrude about the discomfort resulting from the hernia. She had to refrain from lying down directly following *261 a meal because if she did so, she suffered especially marked discomfort. The hiatus hernia persisted from 1970 until decedent's death in 1975. Decedent did eventually learn how to cope with the condition and minimize her discomfort. Dr. J. B. Grace is a medical doctor who, during the 1960's and early 1970's, rendered medical services to decedent. His records reflect that decedent's father died of a stroke at the age of 68 and decedent's mother died of a stroke at the age of 71. During 1970, Dr. Grace examined the decedent and found that she had residual weakness from her 1969 stroke. Dr. Grace examined decedent in 1971 and noted that she was unable to dress herself due to weakness in her right hand. He found that she was able to feed herself. He last examined her August 18, 1972, at which time she advised him that she had fallen twice within the previous year. He also found that she was moving slowly. As of August 18, 1972, decedent was taking the following medications having the following indications: Medication
Indication
Pavabid
Maintain circulation in the
brain to prevent recurrent
strokes
Aldoril-25
Maintain normal blood pressure
Kaon (potassium)
Maintain proper level of potassium
Vivactil tablets
Mild tranquilizer; has been used
for depression
Theragran
Vitamin
Donnatal Exixir
Remedy stomach distress
Placidyl
Remedy insomnia
Laxative tablets
*262 As of September 1972, however, decedent was only taking the Pavabid, Aldoril-25 and Theragran medications. Dr. Grace noted that from 1970 to 1972, decedent became less drpessed, more active, more conversive and, in general, moderately improved. As stated above, Laurence died April 30, 1972. The immediate cause of his death was diagnosed to be a cerebral hemorrhage (commonly known as a stroke). He was stricken ill April 29, 1972, and died one day later. During the early part of 1972 and prior to his death, Laurence had had an earlier slight stroke before leaving Palm Springs. Decedent was aware of this stroke and feared that he might have another, more severe one. Although decedent was greatly saddened by her husband's death, she told Gertrude that it was good that he died so quickly after the stroke as he would have been a "vegetable" had he lived. The Federal estate tax return filed for the estate of Laurence E. Schwab listed a gross estate of $ 268,261.41 and a net estate tax payable of $ 10,625.76. After payment of funeral expenses, expenses of estate administration, and debts, $ 249,454.11 of assets remained in Laurence's estate for distribution under his last *263 will and testament of November 17, 1971, and was distributed as follows: DISTRIBUTEE
Amount
Total
(1) Gertrude H. Schwab
(a) Household furnishings,
jewelry, automobile,
and other tangible
personalty
4,070.50
(b) Jointly owned
personalty
7,706.76
(c) Insurance
6,220.64
(d) 1/2 interest in the
Door County residence
41,500.00
(e) Marital Trust established
under will of Laurence
Schwab for benefit of
Gertrude Schwab
* 65,229.15
124,727.05
(2) Suzanne S. McMurray
(a) Cash
2,500.00
(b) Suzanne S. McMurray
Trust established under
will of Laurence Schwab
55,863.00
58,363.00
(3) John W. McMurray - Cash
2,500.00
2,500.00
(4) James G. Schwab
(a) Cash
2,500.00
(b) James G. Schwab Trust
established under the
will of Laurence Schwab
55,863.00
58,363.00
(5) Katherine Schwab - Cash
2,500.00
2,500.00
(6) Gertrude Wachter - Cash
3,000.00
3,000.00 ** $ 249,453.05
Laurence's will established a Marital Trust for decedent's benefit. The terms of the trust provided that decedent was to be paid all of the income of the *264 trust and so much of the principal thereof as she requested. Upon decedent's death, the principal and accumulated income were to be distributed as decedent specifically appointed by will. In the absence of a valid testamentary appointment, the remaining principal and income were to be added in equal shares to the principal of the James G. Schwab and Suzanne S. McMurray Trusts, also created by Laurence's will. Under the will, decedent was to be paid the income from these latter trusts for her life. Upon her death, the income was to be paid to James and Suzanne if then living, otherwise to their descendants per stirpes then living. However, the trustees were specifically empowered to distribute to each child of James and Suzanne under age 24 so much of the income otherwise payable to James and Suzanne as the trustees determined to be required for the child's reasonable support, education and medical care, if the trustees deemed such distribution to be in the best interests of the child. Upon the termination of these trusts, their principal and accumulated income were to be distributed to James and Suzanne if then living, otherwise to their then-living descendants per stirpes. *265 The trusts were to terminate upon the later of (1) the death of decedent, (2) the attaining of age 40 by James and Suzanne, or (3) Laurence's death. After Laurence's death in April 1972, decedent spent the usual several months at her residence in Door County. The residence was in a very beautiful, sylvan setting, serene and detached from the cares of the workaday world. Decedent appreciated these qualities and they were a great help to her in coping with her husband's death. However, the residence was very isolated and neither decedent nor Gertrude was able to drive. The residence required a significant amount of maintenance which Laurence had performed before his death. Also, a substantial part of the 10 acres surrounding the residence was under cultivation at the time Laurence died and he had directed this activity. After his death decedent was lonesome there and found the maintenance problems burdensome. She put the residence up for sale in the spring of 1972 but found it difficult to sell. She eventually decided to give the residence to some members of her family, as discussed below. On or about August 25, 1972, decedent made the following gifts to the following donees: *266 Age
Relationship
at Time
Donee
to Decedent
of Gift
James G. Schwab
Son
Katherine T. Schwab
Daughter-in-law
Michael L. Schwab
Grandson 4 years
Matthew A. Schwab
Grandson 1 year
Suzanne S. McMurray
Daughter
John W. McMurray
Son-in-law
John W. McMurray, Jr.
Grandson
17 years
Anne B. McMurray
Granddaughter
15 years
Laurence C. McMurray
Grandson
14 years
Susan McMurray
Granddaughter
12 years
Jane D. McMurray
Granddaughter
10 years
Margaret K. McMurray
Granddaughter 8 years
Gertrude Wachter
TOTAL VALUE OF GIFTS
Description of
Donee
Items Given
James G. Schwab
100 shares Eastman Kodak stock
100 shares General Mills stock
Katherine T. Schwab
25 shares Eastman Kodak stock
Michael L. Schwab
25 shares Eastman Kodak stock
Matthew A. Schwab
25 shares Eastman Kodak stock
Suzanne S. McMurray
100 shares Eastman Kodak stock
100 shares General Mills stock
John W. McMurray
25 shares Eastman Kodak stock
John W. McMurray, Jr.
25 shares Eastman Kodak stock
Anne B. McMurray
25 shares Eastman Kodak stock
Laurence C. McMurray
25 shares Eastman Kodak stock
Susan McMurray
25 shares Eastman Kodak stock
Jane D. McMurray
25 shares Eastman Kodak stock
Margaret K. McMurray
25 shares Eastman Kodak stock
Gertrude Wachter
125 shares Eastman Kodak stock
TOTAL VALUE OF GIFTS
*267 Value at
Value at
Date of
Date of
Donee
Decedent's Death
Gift
James G. Schwab
$ 8,931.25
$ 12,925.00
4,450.00
5,462.50
Katherine T. Schwab
2,232.81
3,231.25
Michael L. Schwab
2,232.81
3,231.25
Matthew A. Schwab
2,232.81
3,231.25
Suzanne S. McMurray
8,931.25
12,925.00
4,450.00
5,462.50
John W. McMurray
2,232.81
3,231.25
John W. McMurray, Jr.
2,232.81
3,231.25
Anne B. McMurray
2,232.81
3,231.25
Laurence C. McMurray
2,232.81
3,231.25
Susan McMurray
2,232.81
3,231.25
Jane D. McMurray
2,232.81
3,231.25
Margaret K. McMurray
2,232.81
3,231.25
Gertrude Wachter
11,164.05
16,156.25
TOTAL VALUE OF GIFTS
$ 60,254.65
$ 85,243.75
The gift to Gertrude Wachter was in gratitude for many years of service, out of a sense of moral obligation, and was designed to keep Gertrude with decedent. At the time of these gifts, the McMurray's oldest child, John Jr., was preparing to enter his senior year of high school and would not be attending college for another year, entering in September 1973.The younger children were at earlier stages of their educational careers, corresponding to their respective ages. During September *268 1972, decedent made gifts to James and Suzanne of $ 7,000 cash each (total of $ 14,000). At some time prior to November 14, 1972, John W. McMurray discussed estate planning with decedent. He conveyed the information he had obtained from decedent concerning the testamentary disposition she wished to make to an attorney in his law firm who then drafted the will and trust described immediately below.
On November 14, 1972, decedent created the "Gertrude H. Schwab Trust" and transferred to it all of her remaining property except for her Door County residence. James and Suzanne were named as trustees. Decedent retained the power to revoke the trust by a written instrument signed, acknowledged and delivered to the trustees during her life. The trustees were to pay to decedent all of the trust income and such portion of the trust principal as she might request in writing.However, were decedent to become incapacitated, the trustees were to withhold from her as much of the trust income as they determined not to be necessary for her support and pay to any one or more of her descendants from the income withheld and from principal such amounts as they deemed necessary for such descendants' *269 support and education. The trustees were authorized to make unequal payments to the descendants. Upon decedent's death, the trustees were to pay so much of decedent's funeral expenses, estate administration expenses, enforceable debts, and death taxes as her personal representative requested. After these payments were made, the remaining principal and accumulated income of the trust were to be equally divided into two trusts, the James G. Schwab Trust and the Suzanne S. McMurray Trust. The trustees of the James G. Schwab Trust were the Harris Trust and Savings Bank (the Bank) and James; the trustees of the Suzanne S. McMurray Trust were the Bank and Suzanne. All of the income of these trusts was to be paid to James and Suzanne, respectively, if they were living. Otherwise, in the case of James, to his spouse if living and not remarried, and upon the death or marriage of his spouse, then to his living descendants per stirpes; and in the case of Suzanne, to her living descendants per stirpes. However, if the Bank deemed it in the best interest of James or Suzanne and their respective children, it was empowered at any time to distribute to each child under age 24 as much of the *270 income otherwise payable to James or Suzanne as it determined to be required for the child's reasonable support, education and medical care. The decedent's trust further provided that when James reached age 40, and Suzanne age 45, the trustees of the James and Suzanne Trusts were to distribute one-fourth of the principal of these trusts to James and Suzanne, respectively. The James Trust was to terminate upon the later of James' death, the death or remarriage of his surviving spouse, or decedent's death. The Suzanne Trust was to terminate on the later of Suzanne's or decedent's death. Upon termination, the principal and accumulated income of each trust were to be distributed in equal shares as follows: one share for each then-living grandchild of decedent and one share for the then-living descendants per stirpes of each deceased grandchild of decedent. Decedent's trust further provided that if a share of any trust became distributable to a beneficiary who was an income beneficiary of any other trust held under decedent's trust, the share would be added to and administered as a part of the principal of the other trust. If a share of a trust became distributable to a beneficiary *271 who was not an income beneficiary of another trust then held or then required to be created under decedent's trust, and who had not then attained age 21, the trustees were to retain the share in trust, paying such beneficiary so much of the income and principal as they determined to be required for the beneficiary's reasonable support, education and medical care, and distributing to the beneficiary the remaining amount of principal and undistributed income when he or she reached age 21. Decedent also executed a will on November 14, 1972, which was in effect at the time of her death. Under the will, decedent made bequests of $ 2,500 to her son-in-law John W. McMurray, $ 2,500 to her daughter-in-law Katherine T. Schwab, and $ 3,000 to Gertrude. She bequeathed her jewelry, household furnishings, books, pictures, automobiles, and other such property equally to her son James and her daughter Suzanne. After payment of funeral expenses, estate administration expenses, expenses of last illness, debts and death taxes, all other property of decedent was to be poured over into decedent's trust, executed the same day and described supra. Decedent's will appointed James and Suzanne *272 as the executors of her estate. On or about April 9, 1973, decedent filed a Federal gift tax return for the quarter ending September 30, 1972, in respect of the gifts she made on August 25, 1972, and during September 1972, discussed above. The return showed a gift tax liability of $ 2,282.90 which was paid by the decedent. On May 28, 1973, the Commissioner mailed a notice to the decedent advising that a late filing addition to tax of $ 570.72 plus interest of $ 55.03 had been assessed her in respect of the gift tax return filed on or about April 9, 1973. Lewis C. Murtaugh was the attorney who prepared the return, and had also prepared a number of Federal tax returns for a number of years for the decedent. He responded June 4, 1973, to the Commissioner's notice by a letter asking that the addition be abated due to decedent's ignorance of the change from yearly to quarterly gift tax reporting requirements. The letter contained the following statements: Mrs. Schwab is a lady advanced in years and by reason of her health is unable to sign her name beyond an X. * * * Mr. and Mrs. Schwab * * * were both in poor health for a considerable period of time * * *. * * * [P]ersons *273 well into their eighties could well be forgiven for not knowing the change in the law * * *.
Consistent with past custom, decedent and Gertrude returned to Palm Springs in the fall of 1972 and remained there until April of 1973. When decedent returned to Wisconsin, she decided to remain at her residence in Door County for the spring and summer. On or about November 28, 1973, decedent made the following gifts of Eastman Kodak stock: Number of
Relationship
Age at Time
Shares
Donee
to Decedent
of Gift
Given
James G. Schwab
Son
225
Katherine T. Schwab
Daughter-in-law
25
Michael L. Schwab
Grandson
5 years
25
Matthew A. Schwab
Grandson
2 years
25
Suzanne S. McMurray
Daughter
175
John W. McMurray
Son-in-law
25
John W. McMurray, Jr.
Grandson
18 years
25
Anne B. McMurray
Granddaughter
17 years
25
Laurence C. McMurray
Grandson
16 years
25
Susan McMurray
Granddaughter
14 years
25
Jane D. McMurray
Granddaughter
12 years
25
Margaret K. McMurray
Granddaughter
9 years
25
TOTALS
Value at Date
of Decedent's
value at Date
Donee
Death
of Gift
James G. Schwab
20,095.31
26,592.18
Katherine T. Schwab
2,232.81
2,954.67
Michael L. Schwab
2,232.81
2,954.67
Matthew A. Schwab
2,232.81
2,954.67
Suzanne S. McMurray
15,629.69
20,682.81
John W. McMurray
2,232.81
2,954.67
John W. McMurray, Jr.
2,232.81
2,954.67
Anne B. McMurray
2,232.81
2,954.67
Laurence C. McMurray
2,232.81
2,954.67
Susan McMurray
2,232.81
2,954.67
Jane D. McMurray
2,232.81
2,954.67
Margaret K. McMurray
2,232.81
2,954.67
58,053.10
76,821.69
*274 Shortly after Thanksgiving 1973, decedent and Gertrude again traveled to Palm Springs, as was their wont. Right after New Year's Day 1974, decedent began to feel weak and was having trouble walking. She was examined by Dr. Joseph Sage of Palm Springs. He discovered that she was severely anemic and bleeding internally. Through the use of x-rays he found what appeared to be a tumor in her abdominal area. Dr. Sage placed decedent in a hospital in Palm Springs where she received two or three blood transfusions which corrected the anemic condition by the time she and Gertrude departed Palm Springs. On or about February 13, 1974, a Federal gift tax return was filed with the Internal Revenue Service for the quarter ending December 31, 1973, bearing the signature "Gertrude H. Schwab." This return was not physically signed by the making of decedent's "X" mark but was signed by Gertrude Wachter who executed decedent's signature. The return showed a liability of $7,261.04. At some time before March 16, 1974, Suzanne searched for and located an apartment in Evanstorn, Illinois, for decedent to move into upon her return from Palm Springs. Decedent had decided to move away from her *275 Door County residence to the Cook County, Illinois, area where she would be closer to family and friends. Decedent was informed March 27, 1974, that she was to be admitted to Evanston Hospital. On March 29, 1974, a few days after decedent returned to the Chicago area, a meeting was held at the McMurray home at which decedent, decedent's children, their spouses, Gertrude Wachter, Lewis C. Murtaugh and another family friend were present. At the meeting, decedent conveyed her Door County residence and surrounding real estate to Suzanne and John McMurray, with the understanding that they would ensure that James and Katherine Schwab would receive one-half of the benefit of the transfer.In order to effectuate decedent's wishes, Suzanne and John paid James and Katherine a sum of cash and Suzanne conveyed to them her interest in the sevenacre parcel which decedent and Laurence had given to Suzanne and James in the 1960's. Also during the meeting, decedent executed a document entitled "Statement of Purposes of Gifts Made by Gertrude Schwab and of Her Change of Legal Residence." The document had been prepared by a person or persons other than decedent and purported to set forth, in *276 decedent's own words, her motives for making prior gifts of stock and cash and for the present conveyance of the Door County residence to the McMurrays. The prior transfers were made, according to the document, to ensure that decedent's grandchildren would be able to obtain quality college educations without reducing their families' standard of living. The $ 3,000 per year per donee gift tax exclusion was also stated to be a factor in making these gifts. Decedent was ridding herself of the Door County residence, according to the document, because of her physical limitations, the necessity for being convenient to skilled diagnostic medical attention and treatment and because selling the residence would result in a high capital gain and would deprive her children of their traditional enjoyment of the property. The document represented that decedent was very pleased that the McMurrays would be occupying the Door County residence and that her son James was interested in developing adjacent property as these facts meant that the two families would enjoy future summertimes and possibly, after retirement, even more extended periods together. One of the decedent's motives in transferring *277 the Door County residence to her children rather than selling it was a desire to keep it in the family. On March 31, 1974, decedent was admitted to the Evanston Hospital in Evanston, Illinois, for pre-operative medical evaluation. The procedure being contemplated at that time was removal of a tumor believed to be a carcinoma of the colon. On April 3, 1974, Dr. N. Larson advised decedent that exploratory surgery and a right hemi-colectomy were to be performed upon her. The nature and purpose of, and the risks involved with, the operation were explained to her. On the same day, decedent executed a "Consent to Operation" by affixing her mark thereto. The hospital records for April 3, 1974, reflect that decedent could sit up in a chair if given considerable assistance. On April 4, 1974, Dr. N. Larson, assisted by an anesthesiologist and another surgeon, removed a tumor from decedent's cecum. The operation performed in known as a right hemi-colectomy and involved the removal of four feet of decedent's colon and seven inches of her small intestine together with the mesentieries that drain the area. The operation subjected decedent to fairly substantial risks of mortality. *278 The tumor had encircled 90 percent of her bowel wall and was later determined to be cancerous. Decedent did well initially following the operation, but on or about April 12, 1974, decedent suffered a massive cerebral vascular thrombosis or stroke. Following the stroke, decedent remained comatose or in a comatose condition until her death on March 7, 1975. On or about April 22, 1974, a Federal gift tax return for the quarter ending March 31, 1974, was filed on decedent's behalf with the Commissioner. The return reported the transfer of the Door County residence and showed a gift tax due on $ 15,547.78. On or about November 19, 1974, the following transfers of cash were made to the following transferees from the decedent's property: Age at
Amount
Relationship
Date of
of Cash
Donee
to Decedent
Transfer
Transferred
Michael L. Schwab
Grandson
6 years
2,325.00
Matthew A. Schwab
Grandson
3 years
2,375.00
John W. McMurray, Jr.
Grandson
19 years
1,900.00
Anne B. McMurray
Granddaughter
18 years
1,875.00
Laurence C. McMurray
Grandson
17 years
1,900.00
Susan McMurray
Granddaughter
15 years
1,900.00
Jane D. McMurray
Granddaughter
13 years
1,925.00
Margaret K. McMurray
Granddaughter
10 years
1,975.00
Gertrude Wachter
2,000.00
Total
18,175.00
*279 With the exception of the $ 7,000 gift in 1955 to Suzanne and the gift of the seven-acre parcel to Suzanne and James in the 1960's, mentioned above, the decedent and/or Laurence made no significant gifts prior to August 25, 1972. John W. McMurray, decedent's son-in-law, is a practicing attorney in the city of Chicago, Illinois. As of the time of trial he was a partner in the law firm of Bradley, McMurray, Black and Snyder. He has been a member of that firm and its predecessor at least since 1972. During the years the gifts in issue were made, Mr. McMurray was a very busy lawyer. During the years 1972 to 1974, John W. and Suzanne S. McMurray reported the following amounts of income of their Federal income tax returns: 1972
1973
1974
Dividends
458.00 633.00
885.00
Interest Income
11,072.00 1,201.00
1,473.00
Net Income from Law
Practice
34,147.00 35,313.00
36,228.00
Loss from Sale or
Exchange of Capital
Assets
(387,000)
Totals
35,290.00 37,147.00
38,586.00
The McMurrays incurred the following college expenses for room, board, tuition and application fees for their children: Year
Amount
1972
$ 87.50
1973
3,065.00
1974
5,308.55
1975
7,553.01
*280 These amounts do not include travel expenses incurred in visiting prospective colleges, personal allowances for the children while at school, or transportation expenses incurred by the children in traveling to and from colleges they were attending. During 1971 to 1974 John W. McMurray owned a home in Glencoe, Illinois, which was worth about $ 70,000 in 1972. Glencoe is a very affluent, exclusive nightborhood. As of 1972, John W. McMurray owed only about $ 10,000 on the 5.25 percent mortgage on the home which was the only amount owed on the home. As of the date of trial, none of the shares of Eastman Kodak and General Mills stock which were given by decedent on August 25, 1972, and November 28, 1973, to Suzanne S. and John W. McMurray and their children had been sold. During the period that decedent made the gifts in issue here, she was aware that a taxpayer could give up to $ 3,000 to a donee per year without incurring any Federal gift tax. The following table sets forth the dividends paid per share per year to the holders of common stock in General Mills and Eastman Kodak Corporations, and the total dividend income received by the Schwabs and McMurrays resulting from *281 the decedent's gifts of August 25, 1972, and November 28, 1973: 1971
1972
Dividends
Dividend
Dividends
Dividend
per Share
Income
per Share
Income
SCHWABS: August 25, 1972, Gift: 175 shares Eastman Kodak
$ 1.32
$ 231.00
$ 1.37
$ 239.75
100 shares General Mills
1.75
175.00
.98
98.00
November 28, 1973, Gift: 300 shares Eastman Kodak
1.32
396.00
1.37
411.00
TOTAL FOR SCHWABS:
$ 802.00
$ 748.75
McMURRAYS: August 25, 1972, Gift: 275 shares Eastman Kodak
$ 1.32
$ 363.00
$ 1.37
$ 376.75
100 shares General Mills
1.75
175.00
.98
98.00
November 28, 1973, Gift: 350 shares Eastman Kodak
1.32
462.00
1.37
479.50
TOTAL FOR McMURRAYS:
$ 1,000.00
$ 954.25
GERTRUDE WACHTER: August 25, 1972, Gift: 125 shares Eastman Kodak
$ 1.32
$ 165.00
$ 1.37
$ 171.25
1973
1974
Dividends
Dividend
Dividends
Dividend
per Share
Income
per Share
Income
SCHWABS: August 25, 1972, Gift: 175 shares Eastman Kodak
$ 1.60
$ 280.00
$ 1.92
$ 336.00
100 shares General Mills
1.02
102.00
1.11
111.00
November 28, 1973, Gift: 300 shares Eastman Kodak
1.60
480.00
1.92
576.00
TOTAL FOR SCHWABS:
$ 862.00
$ 1,023.00
McMURRAYS: August 25, 1972, Gift: 275 shares of Eastman Kodak
$ 1.60
$ 440.00
$ 1.92
$ 528.00
100 shares General Mills
1.02
102.00
1.11
111.00
November 28, 1973, Gift: 350 shares Eastman Kodak
1.60
560.00
1.92
672.00
TOTAL FOR McMURRAYS:
$ 1,102.00
$ 1,311.00
GERTRUDE WACHTER: August 25, 1972, Gift: 125 shares Eastman Kodak
$ 1.60
$ 200.00
$ 1.92
$ 240.00
*282 Respondent determined that the following transfers, all discussed in detail above, were made in contemplation of decedent's death and that their values as of the latter date are includable in decedent's gross estate under section 2035: Value of Transfer
Date of Transfer
at Date of Death
August 25, 1972
$ 60,254.65
September 1972
14,000.00
November 28, 1973
58,053.10
March 29, 1974
83,500.00
November 19, 1974
18,175.00
Total
$ 233,982.75
ULTIMATE FINDING OF FACT The gifts made by petitioner from August 25, 1972, through November 19, 1974, were made in contemplation of death. OPINION Five transfers were made by decedent or on her behalf beginning in August 1972 and ending in November 1974. All transfers maintained substantial equality among decedent's children intersese and among decedent's grandchildren intersese. Decedent was 77 in August 1972 and had suffered strokes in 1966 and 1969. Her husband had died of a stroke in April 1972. Both of her parents had died of strokes at the ages of 68 and 71. As a result of the strokes, decedent could not walk without help and her ability to write was reduced to making a mark. Decedent's *283 testamentary plan maintained the same qualities as did her gifts. Three months prior to the transfer of decedent's residence on March 29, 1974, decedent began feeling very weak and was discovered to be severely anemic and to have a tumor. She was hospitalized and given transfusions. She was released but entered another hospital in order to have her tumor removed. Three days prior to her entry, she transferred her residence to her daughter and son-in-law. A short time after the tumor was removed, decedent suffered a massive stroke and lapsed into a coma from which she never recovered. The last transfer was made in November 1974 while decedent was comatose. She died March 7, 1975. The stock she transferred to her daughter and son-in-law and their six children was never sold. As of August 1972, the oldest of these children was 17. The son-in-law was a busy attorney with a steadily growing income and a house worth $ 70,000 in 1972 with an outstanding mortgage of $ 10,000. In 1972, the daughter and son-in-law were entitled to receive $ 5,000 immediately from decedent's husband's estate as well as over $ 90,000 upon decedent's death. All of the gifts were made to decedent's *284 children, grandchildren, or to her housekeeper/companion Gertrude. Gertrude was essentially part of the family and was a natural object of decedent's bounty. Decedent transferred away 35 per cent of her estate in making the gifts and incurred a gift tax liability of $ 25,091.72 in doing so. Section 2035, as applicable to the transfers in issue here, provides: SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH. (a) GENERAL RULE--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death. (b) APPLICATION OF GENERAL RULE.--If the decedent within a period of 3 years ending with the date of his death (except in case of bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, * * * such transfer, * * * shall, unless shown to the contrary, be deemed to have been made in *285 contemplation of death * * *. A transfer is in contemplation of death if the tought of death, as opposed to purposes associated with life, is the impelling or dominant motive of the decedent in making the transfer. It need not be the sole motive. The purpose of section 2035 is to reach substitutes for testamentary dispositions and thereby prevent evasion of the estate tax. United States v. Wells, 283 U.S. 102, 116-17 (1931); Estate of Gerard v. Commissioner, 57 T.C. 749, 758 (1972), affd. per curiam, 513 F.2d 1232 (2d Cir. 1975). As there can be no precise delimitation of the transactions embraced within the concept of transfers in contemplation of death, the circumstances of each case must be analyzed in order to determine the transferor's dominant motive, and each case must accordingly turn upon its own facts. Allen v. Trust Co. of Georgia, 326 U.S. 630, 636 (1946); United States v. Wells, 283 U.S. at 119; Estate of Hill v. Commissioner, 64 T.C. 867, 877-79 (1975); section 20.2035-1(c), *286 Estate Tax Regs. A transfer is prompted by the thought of death if made with the purpose of avoiding death taxes, made as a substitute for a testamentary disposition of property, or made for any other motive associated with death. Section 20.2035-1(c), Estate Tax Regs. The statute establishes a presumption that any gift made within three years of the donor's death is made in contemplation of death. To prevail, the petitioner must come forward with evidence that the transfers were not in contemplation of death, i.e., that they were dominantly motivated by lifetime, as opposed to testamentary, considerations and must further prove this by a preponderance of the evidence. Rockwell v. Commissioner, 512 F.2d 882, 885 (9th Cir. 1975); Estate of Gerard v. Commissioner, supra, 57 T.C. at 757. Although the result in each case depends upon its particular circumstances, this Court has set forth some factors to be considered in arriving at a determination: Among *287 the circumstances to be considered and weighed in determining what was the dominant motive of the decedent in making intervivos transfers of his property, are the following: (a) The age of the decedent at the time the transfers were made; (b) the decedent's health, as he knew it, at or before the time of the transfers; (c) the interval between the transfers and the decedent's death; (d) the amount of the property transferred in proportion to the amount of property retained; (e) the nature and disposition of the decedent, e.g., whether cheerful or gloomy, sanguine or morbid, optimistric or pessimistic; (f) the existence of a general testamentary scheme of which the transfers were a part; (g) the relationship of the donee or donees to the decedent, i.e., whether they were the natural objects of his bounty; (h) the existence of a long established gift-making policy on the part of decedent; (i) the existence of a desire on the part of the decedent to escape the burden of managing property by transferring the property to others; (j) the existence of a desire on the part of the decedent to vicariously enjoy the enjoyment by the donees of the property transferred; * * *. This is *288 not a comprehensive list of the circumstances pertinent to the problem of what transfers are made in contemplation of death, * * *. [Estate of Johnson v. Commissioner, 10 T.C. 680, 688 (1948).] Petitioner's contentions are as follows: (1) The transfers of stock and cash of August 25, 1972, September 1972, November 28, 1973, and November 19, 1974, made to the McMurrays were to provide for the college expenses of the McMurray children which petitioner claims Suzanne and John McMurray were unable to meet; (2) The gifts to Gertrude Wachter of 125 shares of Eastman Kodak stock on August 25, 1972, and of $ 2,000 cash on November 19, 1974, were to express gratitude for many years of faithful service, to recognize a moral obligation which she felt toward Gertrude, and to induce Gertrude to continue as her attendant and companion; (3) Decedent spread her gifts among as many donees as possible in order to take advantage of the $ 3,000 per year per donee exclusion provided by section 2035(b); (4) Decedent gave stock and cash to James and his family in order to treat her descendants equally; and (5) Decedent transferred her Door County residence in order to escape *289 the burdens of maintaining it, to be closer to her family, friends, and medical care, to ensure that her family would continue to enjoy the property, and to avoid realizing a large capital gain. Respondent naturally contends that due to decedent's age, physical condition, and other factors, the thought of decedent's death was the dominant motive behind the transfers. For the reasons stated below, we agree. Estate of Johnson, supra, points us to certain factors, set out above, which tend to be relevant in determining a donor's motivation. We proceed to consider them in light of the facts before us. (a) Age of Decedent at the Time of Transfers: Decedent was 77 at the time of the first transfers on August 25, 1972, and during September 1972, and 79 at the time of the transfers on November 28, 1973, and March 29, 1974. She was thus advanced in years. What makes this factor especially significant here is that decedent's parents both died at much younger ages (68 and 71) and both died of strokes, of which decedent had already had two. Decedent thus may well have felt she was living on borrowed time. Therefore, this factor weighs against petitioner. (b) Decedent's *290 Health, as She Knew It, At or Before the Time of the Transfers: Because we seek the subjective state of mind of the decedent with respect to her transfers, her actual physical condition is relevant only insofar as she was aware of it; only perceived illnesses can engender thoughts of death and trigger transfers which are surrogates for testamentary dispositions. Turning to the case at bar, there can be no doubt that as of August 25, 1972, decedent was aware of the strokes she suffered and of her residual weakness therefrom. She was undoubtedly aware that both her parents and her husband had died of strokes. She knew that she was unable to sign her name beyond a mark or to climb the stairs in her home. Although she and Gertrude lived alone in the four-bedroom Door County residence, Gertrude slept in decedent's room. Decedent was no doubt painfully aware of her hiatus hernia condition. As of August 18, 1972, just a week prior to the first set of transfers, decedent was taking medication to improve circulation to prevent recurrent strokes, to control her blood pressure, and to remedy stomach distress, insomnia and depression. Decedent was likely aware of the conditions for *291 which these medications were prescribed. Her physician, on August 18, 1972, found that decedent was moving slowly and was advised by her that she had fallen twice in the past year. It should be noted that he also found her to be moderately improved since 1970. Decedent was undoubtedly aware of these facts.
Decedent's counsel stated in a letter mailed to the Commissioner June 4, 1973, that decedent was in poor health for a considerable period of time. The third group of transfers occurred November 28, 1973. A little over a month later, decedent began to feel extremely weak, was hospitalized and found to be severely anemic and to have a tumor. On February 13, 1974, a Federal gift tax return was filed for decedent which she was unable to sign even with an "X" mark, indicating that she must have been very weak at the time. Decedent was given transfusions which cured her anemia. She entered Evanston Hospital March 31, 1974, and had the tumor removed April 4, 1974. She did well initially following the surgery but then suffered a massive stroke and lapsed into a coma from which she never recovered. Decedent transferred the Door County residency only three days prior to entering *292 Evanston Hospital. The last transfer was made November 19, 1974, when decedent was in a comatose condition. Those who made these transfers on decedent's behalf, presumably the trustees of the trust she created November 14, 1972, were aware that she had suffered a massive stroke and was comatose. At the very least, decedent must have been aware as of March 29, 1974, of the extreme weakness induced by her anemic condition, that she had recently been in a hospital and received transfusions and that she was soon to enter another hospital. Petitioner contends that decedent, as of March 29, 1974, was unaware of her tumor, and Gertrude testified to that effect at trial. However, the surgeon who actually operated upon decedent, Dr. Larson, testified as follows: I recall the patient, and I am sure that she was aware of her condition when she left the California hospital * * * I'm sure she was aware that she had a tumor when she came into the Hospital. Thus, decedent may very well have been aware of her tumor as well as her anemic condition. In view of the above discussion, we conclude that decedent was aware of being in generally poor health prior to each of the first four transfers. *293 With respect to the final transfer, those who made the transfer were undoubtedly aware of decedent's comatose condition and severe stroke of April 12, 1974. This factor must weigh against petitioner. (c) Interval Between the Transfers and Decedcent's Death: Although decedent did not actually die until March 7, 1975, she lost normal consciousness and became incapable of making further gifts on April 12, 1974, less than two years after the first, and less than two weeks after the last of the transfers. Thus, the intervals were fairly brief and this factor must weigh against petitioner. (d) The Amount of Property Transferred in Proportion to the Amount Retained: A rough measure of this value would be the ratio which the date of death value of the gifts made bears to the sum of (1) the date of death value of all gifts made and (2) the value of the gross estate. This ratio may be computed as follows: $ 233,982.75 / $ 233,982.75 + $ 433,765.80 = 35% Thus, within less than two years, decedent transferred away roughly thirty-five percent of her property, which seems to us to be a substantial amount. This factor accordingly wishes against petitioner. (e) Nature *294 and Disposition of Decedent: There was very little evidence as to decedent's disposition except that she was sorrowed over the death of her husband and as of August 18, 1972, was taking medication designated to combat depression. On the record, this factor weighs slightly against petitioner. (f) Existence of a General Testamentary Scheme of Which the Transfers Were a Part: Less than three months following the August 25 and September 1972 transfers, decedent executed a will and related inter vivos trust which together constituted a dispositive scheme of her entire estate. She transferred all of her remaining property except the Door County residence to the trust. The will made bequests of $ 2,500 each to John W. McMurray and Katherine T. Schwab and one of $ 3,000 to Gertrude. Decedent's personal property was bequeathed equally to her son and daughter, and the residuum was poured over into the trust. The will did not specifically appoint the principal and accumulated income of the Marital Trust established under the will of Laurence for decedent's benefit. The truth of November 1972 was revocable and its income, along with as much of the principal as she might request, *295 was payable to decedent during her life. Upon her death, the trust estate was to be equally divided into two successor trusts, the Suzanne Trust and the James Trust. The income from these trusts was to be paid to Suzanne and James, respectively, during their lives and upon the termination of the trusts, the principal and accumulated income were to be distributed equally to each of decedent's grandchildren, whether or not a given grandchild was a descendant of the parent (James or Suzanne) whose death happened to trigger the termination of a given trust. For example, upon Suzanne's death, the assets remaining in her trust would be distributed to both her children and to James' children, each of these receiving an equal share. Therefore, it is seen that the basic scheme of the testamentary disposition was to preserve equality of benefits among decedent's children intersese and among her grandchildren intersese, i.e., within each of these tiers of descendants. [2]
*296 It is readily apparent that precisely the same equality is manifested in the transfers at issue here. The only exceptions occur in the gifts of November 28, 1973, and November 19, 1974. In the former gift, James received 225 shares of Eastman Kodak stock (date of gift value $ 26,592.18) whereas Katherine received only 175 shares (value of $ 20,682.81). In the latter gift, the Schwab children received $ 900 more than the roughly $ 1,900 per child the McMurray children received. Thus, the James Schwabs received $ 6,809.37 more than they would have under a strictly equal distribution. We note, however, that (1) this is a relatively minor amount compared to the total gifts made by decedent, and (2) decedent had made, in 1955, a $ 7,000 cash gift to Suzanne apparently without making a matching gift to James. It is possible that the later inequalities were designed to redress this earlier one. [3]
*297 Thus, the gifts bear a strong structural similarity to the testamentary disposition made in decedent's will and trust of November 14, 1972, were all made within a brief interval of such date, and appear to be part of decedent's general testamentary scheme. This factor accordingly weighs against petitioner. (g) Relationship of Donees to Decedent: All donees, including Gertrude, were natural objects of decedent's bounty. Gertrude, as we have found, was essentially a part of the family. (h) Existence of Gift-Making Policy: The record reveals that decedent had no established gift-making policy prior to 1972.She had given Suzanne $ 7,000 in 1955, and she and Laurence had given Suzanne and James the seven-acre parcel during the 1960's. Such sporadic and infrequent transfers hardly constitute an established gift-making policy. Hence, this factor weighs against petitioner. (i) Desire to Escape Management Burden: We have no doubt that decedent, being old and very weak, found the upkeep of the Door County property very burdensome even with Gertrude to help, and that this perceived burden motivated her in part to move closer to her relatives. However, this rationale *298 does not explain why she waited until March 29, 1974, to actually transfer the property, after she had had blood transfusions and tumor was found in her abdomen. Petitioner contends that decedent planned since 1972 to transfer the property and that the formal transfer was merely the culmination of a transaction that decedent firmly intended to eventually complete before the discovery of her tumor and anemia, citing Estate of Casey v. Commissioner, 25 T.C. 707, 720 (1956). The following testimony was elicited as to decedent's "plan" to give the residence away: TESTIMONY OF GERTRUDE WACHTER Q Had you discussed the transfer of the Green Bay residence to the McMurrays with Mrs. Schwab, prior to the signing of the deed? A She mentioned it to me, that she was going to -- she expected everything to be drawn up on our return from California, for her to sign. Q Why didn't Mrs. Schwab sell the property instead of transferring it to the McMurrays? A Well, in 1972, she did put the place up for sale. * * * Q So what heppened after that -- that was in 1972, is that correct? A Yeah, that was in the summer and fall of '72. Q When did the idea of transferring *299 the property to the McMurrays first emerge as a possible program? A Well, that idea came up in the conversation. She -- Q When? A It was in the end of 1972, towards the fall, as we were preparing to go out to California again. She was getting a little concerned what was going to happen now, to the place. A * * * She -- I think it was in 1972, she was thinking of living in the town of Ephraim, in a condominium. Q Okay. And how about in '73? A Well, when she came back in '73, she decided against it, since the place had not been sold yet, and she decided to live in her place in Ephraim again, for the summer. Q And how about transferring it to the McMurrays, when did that idea come up? A Well, that was sort of in her mind all along. But then, in 1973, she made up her mind that she would forget about selling the place and giving it to her children. Q Before you left for Palm Springs, after Thanks-giving of 1973, it was pretty well decided that Mrs. Schwab would not return to Door County, was it? A Yes. Yes, we had -- we had practically packed everything that we were going to take with us to live in Evanston, before we left for Palm Springs. Q Did Mr. *300 and Mrs. McMurray visit with Mrs. Schwab and you in February, 1974? A In California, yes.
Q In California, yes. A Uh-huh. Q Were there discussions, further discussions of deeding the Green Bay property at that time? A Yes. The discussions and all that had started in '73. And they came out in '74 and, naturally, they talked about it some more, to get it all set up. TESTIMONY OF JOHN W. McMURRAY A Well, my recollection is that the whole subject of the giving away of the house, of course, had been under discussion for a long time prior to [March 29, 1974]. And it seems to me that, preliminary to the date that this document was signed, that there had been conversations by me with you and by, as far as I know, by other people in the family with you. * * * Q What -- when did the idea of transferring the property to you first -- to you and your wife, I should say, first become a subject of conversation? A * * * And I remember that she put it on the market in the spring or summer, early summer of 1972. Then, in the fall -- it was not an easy house to sell because it was up in the woods. In the fall, there were discussions, I guess, between Mrs. Schwab and others. *301 And she decided that instead of selling it, she would give it away. * * * And so, the first way to begin that solution, it was obvious to me, was she should put it on the market. Later, she took it off the market. I know that. And she -- this was following the discussions with my wife, Suzanne, and her son, in my presence, about giving the property away. First, it is noteworthy that the testimony is conflicting. According to Gertrude, decedent did not give up the idea of selling the residence until 1973, whereas according to John W. McMurray, it was in 1972. Also, the discussions with family members began in 1972 according to John McMurray but not until 1973 by Gertrude's account. More importantly, the testimony bespeaks only of certain "discussions" which decedent had with the McMurrays and other members of her family about giving it away.The whole testimony is pervaded by a sense of vagueness. There is no real indication that decedent was definite about giving away the property until the transfer was actually made March 29, 1974. It is true that Gertrude (or petitioner's counsel) stated that before leaving for Palm Springs in 1973, it was "pretty well decided" *302 that decedent would not return to her residence. But: (1) a few lines earlier, Gertrude and testified that decedent had been considering living in a condominium in Ephraim before she left for Palm Springs in 1972, but decided not to upon her return in 1973. Also, decedent decided to sell the residence and then later changed her mind. Thus, it is apparent that decedent's plans were always subject to change; and (2) the McMurrays visited decedent and Gertrude in Palm Springs in February 1974, after decedent began to feel weak and her anemia was discovered, for further "discussions" about the transfer. Contrast this indefiniteness and uncertainty with the facts of Estate of Casey, supra. There, the decedent had actually approved the final draft of a trust instrument prior to an intervening heart attack. There was no question but that the definite decision to effect the transfer was made prior to the illness, as evidenced by the decedent's approval of the written final draft prior to the heart attack. In the case at bar, by contrast, decedent did not even see a draft of the instrument conveying the residence until after the anemia and tumor were discovered. Thus, *303 we cannot say that decedent's desire to rid herself of the burdens of maintaining the property was more than a subsidiary motive. But it was a motive nonetheless, and we find that this factor tends to favor petitioner. (j) Desire to Vicariously Enjoy Donee's Enjoyment of Transferred Property: Petitioner contends that the other motive of decedent in transferring her residence was to keep it in the family so that her descendants could enjoy it during her lifetime. We feel that this was a motive although not the dominant one. Decedent's children and grandchildren visited there during the summers and it is only natural that one would want his or her family to continue to enjoy a place that had become associated with pleasant family memories over the years. We accordingly conclude that this factor weighs in petitioner's favor. Thus, a review of the Johnson factors comes out rather heavily against petitioner. However, the list is not exhaustive and petitioner, as outlined above, points to other life motives which it claims were dominant with respect to the transfers. Petitioner contends that the transfers of stock and cash made August 25, 1972, September 1972, November 28, 1973, and *304 November 14, 1974, to the McMurrays and the James Schwabs were made to provide for the education of the McMurray children, to treat the Schwabs, who concededly had no need whatsoever, in an equal manner, and to take advantage of the $ 3,000 per year exclusion of section 2503(b). It is true that a purpose to meet the needs of the donee is a motive associated with life rather than death, United States v. Wells, 283 U.S. at 119. The same is true of a desire to treat all of one's offspring alike. Estate of Awrey v. Commissioner, 5 T.C. 222, 241 (1945). Avoiding gift tax by using the $ 3,000 exclusion has also been held to be a purpose associated with life rather than death. Estate of Awrey, supra, 5 T.C. at 241 n.7; Estate of Hoover v. United States, 148 Ct. Cl. 645, 180 F. Supp. 601, 606 (1960). The facts of record, however, belie this sanguine rationale. The first set of gifts on August 25, 1972, was made before any of the McMurray children were in college. The last of the gifts was made when only two McMurray children were *305 in college. Also, the gifts were not limited to the McMurrays, but the Schwabs were treated equally, and their children were far from college age at any relevant time. We have no doubt that decedent desired to treat the Schwabs and McMurrays equally, but such a desire cannot explain why she made a gift in the first place. The same is true of the desire to make full use of the $ 3,000 exclusion. In this case, the equality of distribution smacks of a testamentary scheme, as discussed supra, especially in view of the fact that, with respect to her grandchildrens' education, decedent's trust contemplated unequal distributions during her and her childrens' lifetimes. The "need" of the McMurrays for this stock and cash is questionable at best. John W. McMurray was a successful, busy attorney with a steadily climbing adjusted gross income (from $ 35,290 in 1972 to $ 38,586 in 1974 -- this sum, of course, would exclude nontaxables such as interest on municipal bonds). He owned a house which in 1972 could have been worth, by his own estimate, $ 70,000 and owed only $ 10,000 on it.He thus had an equity of redemption in the house of $ 60,000, on which he could have borrowed for his *306 childrens' education. A particularly telling point is that the stock donated to the McMurrays produced very little income in comparison to the McMurrays' college expenses. The cruelest blow to petitioner's case is the fact that none of the stock has ever been sold. Thus, the McMurrays must have had very little problem in meeting the educational expenses of their children. It is interesting to note that, under Laurence's will, the McMurrays were to receive cash bequests of $ 5,000 in 1972, and would be receiving, upon decedent's death, the $ 55,863 principal and accumulated income of the Suzanne S. McMurray Trust established under Laurence's will, as well as one-half of the principal and accumulated income of the Marital Trust established for decedent under Larence's will because decedent did not specifically appoint the trust principal and accumulated income. This latter trust was worth $ 63,313.65 at the date of decedent's death. Due to decedent's weakened physical condition, and her past history of strokes, decedent and her family must have realized that her life expectancy was not only and that the McMurrays would be receiving plenty of assets under Laurence's will *307 to pay for college. A further reason that we are skeptical of the proffered "education" motive is that decedent gave away such huge chunks of her estate prior to the McMurrays' incurrence of significant college expenses and incurred such large gift tax liabilities in doing so. It would seem that one who was not worried about dying very soon and who wanted to take maximum advantage of the $ 3,000 exclusion would have synchronized the gifts with actual need and have parceled them out so that in any given year no donee would receive much more than $ 3,000. Petitioner contends that decedent was concerned about equality of distribution among her descendants and that this explains why she gave heavily to some with no need. First of all, this argument only goes so far. Decedent could have omitted the large gifts to James and Suzanne and still have made an equal distribution among the grandchildren while more than meeting any educational needs and completely avoiding any gift tax liability. Second, decedent's trust of November 1972 indicates that she tolerated inequality of benefits when necessary to meet special educational needs.Thus, the rigid equality in the gifts tends to point *308 to a motive other than that of meeting education expenses. At the time of the November 19, 1974, transfer, decedent was comatose and lacked the capacity to actually make these transfers. We must assume that they were made on her behalf by the trustees under her November 14, 1972, trust, viz., James and Suzanne. Petitioner seems to argue that the motives of James and Suzanne in making these transfers are to be imputed to decedent for purposes of determining the dominant motive prompting the transfers. We agree. City Bank Farmers Trust Co. v. McGowan, 323 U.S. 594, 598-599 (1945); Haneke v. United States, 548 F.2d 1138, 1140-1141 (4th Cir. 1977); Estate of Himmelstein, 73 T.C. 868, 871-76 (1980); Horner v. United States, 202 Ct. Cl. 649, 485 F.2d 596, 602 (1973). We also agree that the same motives prompted both the November 19, 1974, and earlier transfers of stock and cash to decedent's children and grand-children. However, as outlined above, we do not feel that those motives had very much to do with the education of the McMurray children or with any other inter vivos purposes. We conclude that petitioner *309 has not carried its burden of proving that these transfers were not in contemplation of death. With respect to petitioner's contention that the gifts to Gertrude were made out of a sense of moral obligation and to keep Gertrude with decedent, we note that Gertrude received $ 3,000 in 1972 under the will of Laurence, so that she was already fairly well recompensed before the first of decedent's transfers.Decedent transferred $ 16,156.25 worth of stock to Gertrude in the August 25, 1972, transfer. In our opinion, the gift was an intergral part of the entire transfer. While other motives (e.g., desire to reduce gift tax, desire to treat descendants equally, etc.) may have shaped the ultimate form of the transfer, it is the impelling, dominant motive of the decision to make a transfer in the first place which we seek. We consider that the transfer of August 25, 1972, was essentially a testamentary disposition. In other words, in our view, once decedent decided to make a donative transfer prompted by thoughts of her ultimate death, she perhaps further decided to include Gertrude out of a sense of moral obligation. But the impelling motive of the transfer as a whole was nevertheless *310 the thought of death. The second gift to Gertrude of $ 2,000 on November 19, 1974, is even more clearly an integral part of a testamentary disposition. As Gertrude was no longer taking care of decedent, the gift could not have been to retain her services. Also, it seems unlikely that the gift was out of a sense of moral obligation for past devotion because Gertrude had already received almost $ 20,000 worth of gifts. Finally, we note that Gertrude was bequeathed $ 3,000 in decedent's will. The fact that she was included both in the transfers and in the will also points toward the transfers being part of decedent's testamentary scheme. See the discussion on this point above. Aside from the motives discussed above, petitioner contends that one of the reasons decedent gave away her Door County residence instead of selling it was to avoid a capital gain tax. She would have avoided such a tax, however, had she merely rented it out, or allowed her children to use it, and disposed of it by will. The fact that decedent was recently hospitalized for anemia, received transfusions, and was preparing to again enter the hospital for major surgery when she transferred the residence is *311 in itself highly indicative of death-related motives. Estate of Gerard, 57 T.C. at 760. However, the following unrehearsed testimony of Gertrude concerning the residence firmly convinces us that petitioner has not carried its burden of proving that life motives induced the transfer: A Well, yes, she had a son. Well, she planned to leave -- what she planned and did, leave it to her daughter and her son. Q Give it to her daughter. A Give it, yes. Give it to her daughter and her son * * *. We conclude that petitioner has not carried its burden of proving that the transfers in issue here were not made in contemplation of death. To reflect the foregoing, Decision will be entered for the respondent. Footnotes
1. All section references are, unless otherwise indicated, to the Internal Revenue Code of 1954, as amended and as in effect at all times relevant to this case.↩
*. At the date of decedent's death, this trust was worth $ 63,313.65. ** Unexplained discrepancy of $ 1.06.↩
2. We are not unmindful that at various times during the life estates of decedent and of James and Suzanne, the trustees were authorized to make unequal distributions for the support and education of decedent's descendants. We simply do not feel that these provisions significantly alter the overall intra-generational equality of distribution contemplated by decedent's dispositive scheme.↩
3. Petitioner points out that, had this been the case, decedent should have redressed the old inequity upon her first transfer rather than her third and fifth. It is possible that, as the 1955 gift was so long ago, decedent may not have recalled it until after the 1972 transfers. In any event, we do not feel that the $ 6,809.37 deviation significantly alters the overall scheme of equal treatment.↩